```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MICHIGAN
                         SOUTHERN DIVISION



UNITED STATES OF AMERICA,

               Plaintiff,
                                         HONORABLE NANCY G. EDMUNDS
        v.
                                         No. 14-CR-20119
D-1 RAMIAH JEFFERSON
D-3 EVAN ALEXANDER JOHNSON
D-4 MARIO PHILLIP GARNES

               Defendants.
_____/



                    EXCERPT OF JURY TRIAL – VOLUME 5

            Detroit, Michigan – Wednesday, July 29, 2015


Appearances:

Eric Doeh
Andrew Goetz
Eaton Brown
United States Attorney's Office
211 W. Fort Street, Suite 2001
Detroit, MI 48226-3211
313-226-9569
Email: eric.doeh@usdoj.gov

Harold Z. Gurewitz
Jason Eggert
Gurewitz & Raben, PLC
333 W. Fort Street, Suite 1400
Detroit, MI 48226
313-628-4733
Email: hgurewitz@grplc.com
On behalf of D-1 Jefferson


            Suzanne Jacques, Official Court Reporter
    www.transcriptorders.com • email: jacques@transcriptorders.com
```

```
APPEARANCES(continued)

Randall C. Roberts
117 N. First Street, Suite 104
Ann Arbor, MI 48104
734-677-3393
Email: randallcroberts51@yahoo.com
On behalf of D-3 Johnson

James W. Amberg
Amberg and Amberg
104 W. 4th Street, Suite 300
Royal Oak, MI 48070
248-681-6255
Email: jamberg@amberglaw.net
On behalf of D-4 Garnes
```

                          -    -    -

Suzanne Jacques, Official Court Reporter
www.transcriptorders.com • email: jacques@transcriptorders.com

Excerpt of Jury Trial — Volume 5
Wednesday, July 29, 2015


**I  N  D  E  X**

–   –   –

<u>Government's Case in Chief</u>                              <u>Page</u> <u>Volume</u>


**Earl Douglas Robinson**

    Direct Examination By Mr. Goetz            5      1

    Cross Examination By Mr. Roberts          15

**Antwuan Council (Continued)**

    Direct Examination By Ms. Brown           29     1

    Voir Dire Examination By Mr. Gurewitz     68

    Resume Direct Examination By Ms. Brown    72

    Cross Examination By Mr. Gurewitz        132


Certification of Reporter                         152

–   –   –

Case No. 14-CR-20119

Excerpt of Jury Trial – Volume 5
Wednesday, July 29, 2015


I N D E X (Continued)

- - - -

<u>Government's Exhibits</u>

| <u>Number</u> | <u>Received</u> | <u>Volume</u> |
|---|---|---|
| 1 | 131 | 1 |
| 2 | 132 | 1 |
| 3 | 132 | 1 |
| 15 | 71 | 1 |
| 58 | 10 | 1 |
| 59 | 11 | 1 |
| 61 | 12 | 1 |
| 62 | 13 | 1 |
| 63 | 14 | 1 |
| 64 | 15 | 1 |
| 143 | 128 | 1 |

- - -

<u>Defendant's Exhibits</u>

| <u>Number</u> | <u>Received</u> | <u>Volume</u> |
|---|---|---|
| 503 | 151 | 1 |

Case No. 14-CR-20119

Earl Douglas Robinson – Direct Examination
Wednesday, July 29, 2015

1          Detroit, Michigan

2          Wednesday, July 29, 2015

3          9:05 a.m.

4                    –   –   –

5          **MR. GOETZ:**  Thank you, Your Honor.  Government

6      calls ATF Special Agent E. Douglas Robinson.

7          **THE COURT:**  Okay.  Mr. Robinson, raise your right

8      hand, please.

9                    **EARL DOUGLAS ROBINSON,**

10       at 9:05 a.m., being first duly sworn by the Court

11       to tell the truth, was examined and testified upon

12       his oath as follows:

13                    **DIRECT EXAMINATION**

14     **BY MR. GOETZ:**

15     Q.  Agent Robinson, could you please state and spell your name

16     for the record?

17     A.  Earl Douglas Robinson, E-A-R-L, D-O-U-G-L-A-S

18     R-O-B-I-N-S-O-N.

19     Q.  And Agent Robinson, what is your current occupation?

20     A.  Currently, I'm the acting resident agent in charge of the

21     Lexington, Kentucky III Field Office in Lexington, Kentucky

22     for the U.S. Department of Justice Bureau of Tobacco, Firearms

23     and Explosives.

24     Q.  How long have you been with the ATF?

25     A.  Approximately 27 years.

Case No. 14-CR-20119

Earl Douglas Robinson – Direct Examination
Wednesday, July 29, 2015

 1   Q.  And what are your responsibilities with ATF?

 2   A.  My responsibilities include investigating federal

 3   firearms, arson, explosives, alcohol, cigarette violations,

 4   also federal violations of the narcotics laws as they relate

 5   to the possession of firearms.

 6   Q.  Is one of your job responsibilities to execute federal

 7   arrest warrants?

 8   A.  Yes, it is.

 9   Q.  I want to direct you to the morning of March 20, 2014.

10   Did you execute an arrest warrant on that day?

11   A.  I did.

12   Q.  Who was that arrest warrant for?

13   A.  The individual's name was Evan Johnson.

14   Q.  Where did you execute that arrest warrant?

15   A.  We executed that warrant in Frankfort, Kentucky.

16   Q.  Did you execute it at any particular location in Frankfort

17   Kentucky?

18   A.  The address was 565 Shankill Lane.  The apartment, I

19   think, was 806 maybe.

20   Q.  Did anyone else assist you in executing that arrest

21   warrant?

22   A.  Yes, there were other ATF agents from the Lexington field

23   office along with uniform field officers of the Frankfort

24   Police Department in Frankfort, Kentucky.

25   Q.  Could you please describe what you did to execute the

Earl Douglas Robinson - Direct Examination
Wednesday, July 29, 2015

1    arrest warrant on that morning?

2    A.  That morning at approximately 07:45 hours, myself and

3    uniform officer from the Frankfort Police Department along

4    with other ATF special agents went to the apartment door,

5    which I believe was 806 there on Shankill Lane.  I knocked on

6    the door and an individual answered the door, an African

7    American individual.  I immediately recognized him to be the

8    person in the photograph that I had received from Michigan as

9    a person who was wanted on charges up in Michigan, and upon

10   seeing that, placed him under arrest.

11   Q.  What was that individual's name?

12   A.  Evan Johnson.

13   Q.  Do you recognize him in the courtroom?

14   A.  Yes.

15   Q.  Could you point to him, please, describe him?

16   A.  It's the individual with, he's got a black and white tie

17   and a dark suit.

18            MR. GOETZ:  Could the record reflect that the

19   witness has identified defendant Evan Johnson, please?

20            THE COURT:  Record will so reflect.

21   BY MR. GOETZ:

22   Q.  Now, you said Mr. Johnson was taken into custody?

23   A.  That's correct.

24   Q.  Did you conduct a security sweep of the apartment?

25   A.  Yes, we did.  Myself and Officer Wilson with the Frankfort

Earl Douglas Robinson – Direct Examination
Wednesday, July 29, 2015

1    police department, and a couple other ATF agents, did conduct

2    a security sweep of the apartment, yes.

3    Q.  Why did you conduct a security sweep?

4    A.  To make --

5              **MR. ROBERTS:**  Objection, relevance.

6              **MR. GOETZ:**  Explains what they're doing and why

7    they're doing it.

8              **THE COURT:**  Overruled.

9    A.  We do that to make sure that there are no other

10   individuals in the apartment, no other dangers to law

11   enforcement as -- in those types of situations.

12   **BY MR. GOETZ:**

13   Q.  What did you do to conduct the security sweep?

14   A.  We checked a bedroom, there was a living room and a

15   kitchen area.  I just went into those areas and observed, make

16   sure that, again, there with were no other individuals in the

17   location or no things that would harm the agents.

18   Q.  Did you see anything of interest during the security

19   sweep?

20   A.  During the security sweep, there was a bedroom that had a

21   mattress lying on the floor that also had a cell phone next to

22   the mattress, and there was a closet in the bedroom, as well

23   that, on a shelf in the closet there were two spent shell

24   casings along with two live rounds of ammunition.

25   Q.  Just so we're clear, what are spent shell casings?

Earl Douglas Robinson – Direct Examination
Wednesday, July 29, 2015

1   A.  Those are the casings that are left once a firearm has

2   been fired where the actual round has expelled from the

3   casing, the casing is left.

4   Q.  Did you advise Mr. Johnson of his Miranda rights?

5   A.  I did.

6   Q.  Did you ask Mr. Johnson whether he would consent to ATF

7   taking custody of his cell phone, the spent shell casings and

8   the two live rounds of ammunition?

9   A.  I did.

10  Q.  Did he consent to those items being taken into custody by

11  ATF?

12  A.  He did.

13  Q.  Was that consent recorded in writing?

14  A.  Yes, it was.

15  Q.  Did ATF then take custody of the cell phone, the two spent

16  shell casings and the two live rounds of ammunition?

17  A.  Yes, we did.

18  Q.  If you could please turn to the front of the exhibit

19  binder in front of you.  You have before you what has been

20  marked as Government Exhibit 58?

21  A.  Yes.

22  Q.  Are you familiar with Government's Exhibit 58?

23  A.  Yes.

24  Q.  What is Government's Exhibit 58?

25  A.  This is a photograph that I took of the spent shell casing

Case No. 14-CR-20119

1    and the live round that were in a closet on a shelf in the

2    bedroom of Mr. Johnson.

3    Q.  Does Government's Exhibit 58 fairly and accurately depict

4    the closet in Mr. Johnson's apartment on the day of the

5    arrest?

6    A.  Yes, it reflects the shelf.

7            **MR. GOETZ:**  Government would move to admit Exhibit

8    58.

9            **MR. ROBERTS:**  Same objection, 401, 403, 404(b).

10           **THE COURT:**  Overruled, received.

11           (Government's Exhibit 58 received into evidence.)

12   **BY MR. GOETZ:**

13   Q.  Could you describe for the jury what we're seeing here on

14   Government Exhibit 58?

15   A.  This is a shelf in the closet of Mr. Johnson's room, and

16   there are -- there's two shell casings and two spent rounds

17   there.  I'm not sure that I can tell which is which in this

18   picture.

19   Q.  And where are those shell casings and rounds located on

20   the picture?

21   A.  Can I point?

22   Q.  If you could just describe.

23   A.  There's a shell casing to the front of the closet shelf,

24   and then there's a spent round, I'm sorry, another spent shell

25   casing toward the back along with two smaller live rounds that

Earl Douglas Robinson – Direct Examination
Wednesday, July 29, 2015

1    are behind the other casing.

2    Q.   Okay.  Next, I'm going to show you a physical exhibit that

3    has been marked as Government's Exhibit 59.

4              **MR. GOETZ:**  Your Honor, may I please approach?

5              **THE COURT:**  You may.

6    **BY :**

7    Q.   Could you please open the evidence envelope for Government

8    Exhibit 59.

9              Are you familiar with Government's Exhibit 59?

10   A.   Yes.

11   Q.   What is Government's Exhibit 59?

12   A.   This is the cell phone that was observed next to the

13   mattress in Mr. Johnson's room.

14   Q.   Is Government Exhibit 59 in substantially the same

15   condition as when you recovered it?

16   A.   Yes.

17             **MR. GOETZ:**  Government would move to admit Exhibit

18   59.

19             **MR. ROBERTS:**  We object–no, not on that one, never

20   mind.

21             **THE COURT:**  Received.

22             (Government's Exhibit 59 received into evidence.)

23   **BY MR. GOETZ:**

24   Q.   Next, I'm going to show you another physical exhibit

25   marked as Government's Exhibit 61.

Case No. 14-CR-20119

Earl Douglas Robinson – Direct Examination
Wednesday, July 29, 2015

1        Your Honor, may I approach again, please?

2        **THE COURT:**  You may.

3   **BY MR. GOETZ:**

4   Q.  Could you please open the envelope that encloses

5   Government Exhibit 61?

6        Are you familiar with Government's Exhibit 61?

7   A.  Yes, this is one of the spent shell casings which is the

8   38 caliber that was taken into custody by myself that was

9   found on the closet shelf of Mr. Johnson's room.

10  Q.  Does Government's Exhibit 61 appear to be in substantially

11  the same condition as when you recovered it?

12  A.  It does appear to be so, yes.

13       **MR. GOETZ:**  Government would move to admit Exhibit

14  61.

15       **MR. ROBERTS:**  Same objection, 401, 403, 404(b).

16       **THE COURT:**  Overruled.  Received.

17       (Government's Exhibit 61 received into evidence.)

18  **BY MR. GOETZ:**

19  Q.  Showing you another exhibit, this one marked as Government

20  Exhibit 62.

21       **MR. GOETZ:**  Your Honor, may I please approach?

22       **THE COURT:**  You may.

23  **BY MR. GOETZ:**

24  Q.  Would you please open the envelope associated with

25  Government Exhibit 62.

Case No.  14-CR-20119

Earl Douglas Robinson - Direct Examination
Wednesday, July 29, 2015

1   A.  This exhibit is a second spent shell casing that was

2   recovered on the shelf in the closet of Mr. Johnson's room the

3   day we arrested him.

4   Q.  And is Exhibit 62 in substantially the same condition as

5   when you recovered it?

6   A.  It does appear to be so, yes.

7          **MR. GOETZ:**  The government would move to admit

8   Government Exhibit 62, please?

9          **MR. ROBERTS:**  Objection 401, 3 and 4(b).

10         **THE COURT:**  Overruled, received.

11         **MR. GOETZ:**  Two more.

12         (Government's Exhibit 62 received into evidence.)

13  **BY MR. GOETZ:**

14  Q.  Next, I'm going to show you what has been marked

15  Government Exhibit 63.

16         **MR. GOETZ:**  Your Honor, may I please approach?

17         **THE COURT:**  You may.

18  **BY MR. GOETZ:**

19  Q.  I've handed you an envelope containing Government's

20  Exhibit 63.  Could you please open that envelope.  Are you

21  familiar with Government's Exhibit 63?

22  A.  Yes, this is one of the live rounds recovered in the

23  closet on the shelf of Mr. Johnson's room by myself.

24  Q.  Particular type of ammunition?

25  A.  This is the nine millimeter round.

Case No. 14-CR-20119

Earl Douglas Robinson – Direct Examination
Wednesday, July 29, 2015

1   Q.  And is that exhibit, Exhibit 63, in substantially the same

2   condition when you recovered it?

3   A.  It does appear to be, yes.

4           MR. GOETZ:  Government would move to admit

5   Government's Exhibit 63.

6           MR. ROBERTS:  Objection, 401, 3, and 404(b).

7           THE COURT:  Overruled received.

8           (Government's Exhibit 63 received into evidence.)

9   BY MR. GOETZ:

10  Q.  Last one is Exhibit 64, another government exhibit.

11          MR. GOETZ:  Your Honor, may I approach?

12          THE COURT:  You may.

13  BY MR. GOETZ:

14  Q.  I've handed you an envelope containing Government's

15  Exhibit 64.  Could you please open that envelope?

16  A.  This is the .25 caliber live round that was recovered on

17  the shelf in the closet of Mr. Johnson's room the day we

18  arrested him.

19  Q.  And is that exhibit, Exhibit 64, in substantially the same

20  condition as when you recovered it?

21  A.  Does appear to be so, yes.

22          MR. GOETZ:  Okay.  Government would move to admit

23  Exhibit 64.

24          MR. ROBERTS:  Objection, 401, 403 and 404.

25          THE COURT:  Overruled, received.

Case No. 14-CR-20119

Earl Douglas Robinson – Cross Examination
Wednesday, July 29, 2015

1          (Government's Exhibit 64 received into evidence.)

2          **MR. GOETZ:**  Thank you, Your Honor.  May I please

3     approach to get the exhibit?

4          **THE COURT:**  You may.

5          **MR. GOETZ:**  If I could have one moment to confer

6     with co-counsel.

7          **THE COURT:**  Sure.

8          (Brief pause.)

9          **MR. GOETZ:**  Nothing further from the government.

10          **THE COURT:**  All right.  Thank you.  Mr. Roberts?

11          **MR. ROBERTS:**  Thank you, Your Honor.

12     (9:19 a.m.)

13                    **CROSS EXAMINATION**

14     **BY MR. ROBERTS:**

15     Q.  Good morning.

16     A.  Good morning, sir.

17     Q.  I probably missed, but you're the resident agent in the

18     same town or city that this search was conducted in?

19     A.  Right now I am, yes.  At that point, I was not.

20     Q.  All right.  You're familiar with where Kentucky State

21     University is, correct?

22     A.  I am.

23     Q.  On the way to execute your search with your fellow team

24     members, did you pass through or near Kentucky State

25     University en route?

Case No. 14-CR-20119

Earl Douglas Robinson – Cross Examination
Wednesday, July 29, 2015

1    A.  I don't recall because there are a couple of different

2    ways to get to that address.  I just don't recall if we passed

3    K State or not.

4    Q.  Okay.  The apartment location itself, is it in a complex

5    of apartments?

6    A.  Yes.

7    Q.  More than one building?

8    A.  That's correct.

9    Q.  Is this -- do you remember the name of the apartment

10   complex?

11   A.  I do not.

12   Q.  Does it have any university logo, moniker or name

13   associated with it like Campus Apartments or U Apartments or

14   KU Apartments?

15   A.  I do not recall that there were any type of logos related

16   to K State for that complex.

17   Q.  Are you a K State fan?

18            **MR. GOETZ:**  Objection, relevance, Your Honor.

19            **MR. ROBERTS:**  Just to maybe, Your Honor --

20            **THE COURT:**  Sustained.  Just -- I mean, sustained.

21   **BY MR. ROBERTS:**

22   Q.  You're familiar with the colors of Kentucky State

23   University?

24            **MR. GOETZ:**  Same objection, Your Honor.

25            **THE COURT:**  I'm not sure what you're getting at.

Case No.  14-CR-20119

Earl Douglas Robinson – Cross Examination
Wednesday, July 29, 2015

1          **MR. ROBERTS:**  I'm just trying to establish the

2    locale of this apartment, Your Honor.

3          **THE COURT:**  Okay.  Well, you don't need to go into

4    the colors and whether he's a fan or not to do that.  I mean,

5    I think he can answer with respect to the location.

6          **MR. ROBERTS:**  All right.  Thank you, Your Honor.

7    **BY MR. ROBERTS:**

8    Q.  Is it close to Kentucky State University, this apartment

9    that you went to that day?

10    A.  It is, it's relatively close, yes.

11    Q.  Could you see the campus from, if you could see through

12    the trees around the apartment?

13    A.  No, it's not that close.

14    Q.  Okay.  This was at 7:45 a.m.?

15    A.  Yes, that's correct.

16    Q.  Is it an outer door or an inner door from the hallway that

17    you had gained access or made contact?

18    A.  It's an inner door from a hallway.

19    Q.  First or second floor?

20    A.  Second floor.  You walk into the outer door and then up

21    some stairs.

22    Q.  All right.  When you approached that particular apartment

23    that you were focusing on, did you ring or knock?

24    A.  Initially, the outer door was open, so we just opened the

25    outer door.  Then we walked up the stairs to the apartment

Earl Douglas Robinson – Cross Examination
Wednesday, July 29, 2015

 1    main door and we knocked.

 2    Q.  Okay.  So the communal hallway was accessible to you?

 3    A.  Yes.

 4    Q.  Okay.  And you knocked.  Were you the knocker?

 5    A.  Yes.

 6    Q.  Did you hear movement immediately associated with your

 7    knock?

 8    A.  I don't recall if we heard any movement immediately.  I

 9    don't recall that.

10    Q.  Did you have to knock more than once?

11    A.  Yes.

12    Q.  Do you remember how many times?

13    A.  No, I do not.

14    Q.  And someone, you've identified the person that responded

15    by, what, they opened the door?

16    A.  Yes.

17    Q.  Was there a "who's there" first from the person?

18    A.  I do not recall that.

19    Q.  Do you remember if there was one of those peepholes in the

20    door?

21    A.  I don't remember, but I would assume there is because most

22    apartments have that, but I don't remember specifically.

23    Q.  All right.  Were you fully emblazoned in some kind of

24    markings that would indicate that you were law enforcement?

25    A.  Our vest has ATF Police on it.  I did have that on.  I

Earl Douglas Robinson – Cross Examination
Wednesday, July 29, 2015

1    also had a uniformed officer standing right next to me, which

2    is generally what we do, so any time that anyone has any

3    question as to whether or not we were the real police then we

4    have that uniform officer there with us.

5    Q.   Okay.  So you had local law enforcement individuals

6    assisting?

7    A.   Yes.

8    Q.   How many people were around the door when Mr. Johnson

9    opened the door?

10   A.   The stairway was very narrow.  To the best of my

11   recollection, my guess is we had one uniformed officer and

12   maybe four agents.

13   Q.   Okay.

14   A.   Including myself.

15   Q.   And you were there to arrest the individual that you had

16   received an arrest warrant for the day before on the 19th of

17   March?

18   A.   I don't recall exactly when I received -- it comes to us

19   in a -- when I received the warrant.  It comes to us in a

20   collateral request, and once we get it then we will  follow up

21   on it.

22   Q.   Did you have the photo right there with you on scene, the

23   photograph that helped you identify the individual that opened

24   the door?

25   A.   Yes, we have -- we do an operational plan which has photos

Case No. 14-CR-20119

Earl Douglas Robinson – Cross Examination
Wednesday, July 29, 2015

1    of whoever it would be that we need to arrest, yes.

2    Q.  Okay.  And you were there for that total and sole purpose,

3    to bring this person into custody and help get him spirited

4    back up here to face this indictment, correct?

5    A.  That's correct.

6    Q.  When Mr. Johnson opened the door, what was the first thing

7    that you said to him?

8    A.  I don't remember specifically.  I recognized him from the

9    photograph.

10   Q.  Yes.

11   A.  I don't remember other than "are you Evan Johnson" maybe.

12   Q.  Would be a natural question.

13   A.  And I think he said yes, and I advised him who I was and

14   that we had a warrant for his arrest.

15   Q.  Did you direct him to come toward you, into custody?

16   A.  No, I think I stepped in, because we knew we had to do a

17   security sweep of the location, so I think I stepped inside

18   and spoke to him right there at the door.

19   Q.  When Mr. Johnson opened the door, how was he attired?

20   A.  I think he -- he looked like he'd just gotten up.  His

21   eyes were kind of gazy, you know, sleepy.  I don't remember

22   exactly what he had on.  I faux know he didn't have any shoes

23   on because he had actually asked us to allow him to get shoes.

24   Q.  Did you -- now, I don't mean anything by this, but when

25   you're in the process of executing one of these warrants, this

Earl Douglas Robinson - Cross Examination
Wednesday, July 29, 2015

1  is a very serious matter, correct?

2  A.  Well, any time that you're going to arrest someone it's a

3  serious issue.

4  Q.  Yes, sir.  So was there a moment, then, that, in order to

5  control and make sure there wasn't a situation, that you put

6  your hand out on Mr. Johnson after you informed him what your

7  purpose was to arrest him on this warrant?

8  A.  I don't know.  I don't think I did initially because we

9  had the uniformed officer there, we had two other agents that,

10  once he opened the door and we identified him, they went in to

11  secure, do a security sweep of the location to make sure that

12  there were no, again, no other occupants, nothing in there

13  that would harm us.  But I don't remember actually putting my

14  hand on him at that point.  One of the other agents may have

15  put their hand on him and, you know, sort of grabbed his

16  shoulder.  He wasn't being difficult or anything.

17  Q.  No, no, I wasn't suggesting.

18  A.  And moved him sort of toward the kitchen area.  That's

19  kind of the way I remember it, but again it's been over a year

20  ago so...

21  Q.  And Mr. Johnson certainly didn't adopt any offensive

22  position toward you folks when he opened the door, did he?

23  A.  He did not.

24  Q.  When -- you were focusing in your answer a minute ago

25  about the necessity of doing this protective sweep.  Did you

Earl Douglas Robinson – Cross Examination
Wednesday, July 29, 2015

1    hear any sounds like from a television or a radio or some

2    unknown source emanating from the apartment, other than the

3    conversation you were having with Mr. Johnson at the door?

4    A.  No.

5    Q.  And the protective sweep, as we understood your testimony,

6    is exactly what it stands for, protection, correct?

7    A.  Correct.

8    Q.  You want to make sure there are no other individuals,

9    human beings, in that location, inside that location that

10   could cause harm to you or your fellow investigators or

11   officers, correct?

12   A.  That is correct.

13   Q.  And the second purpose I think I heard you mention was to

14   make sure that there's nothing inside that apartment that

15   you're now going into that could harm you or your fellow

16   agents, correct?

17   A.  That's correct.

18   Q.  Was it daylight yet, or day break, at that time in March?

19   A.  Yes, it was.

20   Q.  Did you have any occasion to flip on any light switches to

21   illuminate the inside of the apartment that you had felt

22   compelled to enter?

23   A.  At that point in time, I don't remember turning on a

24   light, but I'm sure we did, but I just don't remember it.

25   Q.  Did you have any flashlights or lanterns with you as part

Case No. 14-CR-20119

Earl Douglas Robinson - Cross Examination
Wednesday, July 29, 2015

1    of your process of searching?

2    A.  Yes, we had flashlights.

3    Q.  Did you personally use a flashlight while you were doing

4    your portion of the protective sweep?

5    A.  Yes.

6    Q.  Was this a one-bedroom apartment?

7    A.  Yes.

8    Q.  Did more than one individual do the protective sweep with

9    you?

10   A.  Myself and the uniformed officer went into -- I think we

11   went into the bedroom, and then the other agents did the area

12   of the living room and the kitchen.

13   Q.  Were your weapons drawn?

14   A.  I don't recall specifically, but any time we do a security

15   sweep, then those weapons would be drawn, yes.

16   Q.  And Mr. Johnson, while this was occurring, was being

17   maintained.  Now he had been put back into the kitchen area

18   and he was being maintained by another member of the team,

19   correct?

20   A.  That's correct.

21   Q.  He probably had been handcuffed by this point, hadn't he?

22   A.  I'm not sure.

23   Q.  Not sure?

24   A.  No.

25   Q.  Did you do an operational tactic like we see on TV where

Case No. 14-CR-20119

Earl Douglas Robinson – Cross Examination
Wednesday, July 29, 2015

1    each one announces "clear" when they look in the place they're

2    looking?

3    A.  Yeah, generally that's what we do, yes.

4    Q.  And you said you focused on the bedroom itself.

5    A.  Yeah, the bedroom was right off the entrance of the

6    apartment.  I mean, it was just, it was -- if I recall

7    correctly, once you walk, step into the apartment, the bedroom

8    is to the right of the front door.

9    Q.  Did the closet, was that inside the bedroom that you've

10   just described?

11   A.  Yes, it was.

12   Q.  Did it have a door, a bi-fold or a single panel door that

13   opened?

14   A.  I think it was a sliding door.

15   Q.  Into-the-wall sliding, or just across the opening?

16   A.  Yeah, across the opening I think is what it was.

17   Q.  Was it open?

18   A.  Yes, it was partially open.

19   Q.  Did you use your flashlight and look inside?

20   A.  Yes.

21   Q.  You didn't see a body in there, a human being?

22   A.  No, I did not.

23   Q.  Then you gazed up on the shelf?

24   A.  Correct.

25   Q.  You didn't think there was going to be a human being on

Case No. 14-CR-20119

Earl Douglas Robinson – Cross Examination
Wednesday, July 29, 2015

1    the shelf, did you?

2    A.  No, but, again, there could be firearms.

3    Q.  Yes.

4    A.  There could be needles, anything in these type of

5    situations.

6    Q.  Sure.  You could see with your illumination the shelf,

7    couldn't you?

8    A.  Correct.

9    Q.  And is the shelf that we see depicted in Exhibit 58 in the

10   same condition it was when you first lit it up with your

11   flashlight?

12   A.  Yeah, as far as I, as far as I can remember.  As far as I

13   can remember, yes.

14   Q.  Now, one of the things that you may have an occasion to do

15   when you conduct this kind of protective sweep is ascertain if

16   there's a firearm present, correct?

17   A.  Yes, in plain view.  Because once you start moving things

18   around, now you're searching and that's not, we can't do that.

19   Q.  Well, then, this would have to be, this picture, exactly

20   as you saw it when you lit it up with your light?

21   A.  It would have to be, yes.

22   Q.  I was going to ask, and I still will, you don't want to

23   touch anything that you find that may be something that needs

24   to be preserved for prints, correct?

25   A.  That's correct.

Case No. 14-CR-20119

Earl Douglas Robinson - Cross Examination
Wednesday, July 29, 2015

1   Q.  So if you found a pistol, could you use a pen, for

2   instance, to hook the handle, or not the handle but the

3   trigger guard so you wouldn't have to touch it?

4   A.  You could.

5   Q.  Could you also use a pen-like object to just lift up the

6   cap or the lid on that cap to make sure there wasn't a gun

7   under there?

8   A.  I'm sorry, what was that again?

9   Q.  Okay.  In the picture, 58, the shelf depicts what looks

10  like at least one baseball kind of cap.

11  A.  Okay.

12  Q.  Okay.  If a person in your position during this protective

13  sweep was concerned there may be a firearm hidden under that

14  cap, you could lift the lid, couldn't you?

15  A.  Well, I think at that point you would be getting into more

16  of a search once you start moving things around and looking.

17  Q.  Fair enough, fair enough.

18        Can you tell us at least by some geographical term

19  where Exhibit 61 is in this array on Exhibit 58?

20        **MR. GOETZ:**  Your Honor, if he's going to do that,

21  could he at least describe what Exhibit 61 is since those are

22  the government's exhibit numbers?

23        **MR. ROBERTS:**  I'm sorry, I thought he had them all

24  up there with you.  Did you take them back?

25        **MR. GOETZ:**  I did.

Case No. 14-CR-20119

Earl Douglas Robinson - Cross Examination
Wednesday, July 29, 2015

1      **THE COURT:**  Let's just move along on this.  61 is

2   one of the spent shell casings and 58 is a photo of the shell.

3   You want to know where the casing was on the shelf?

4      **MR. ROBERTS:**  Yes.

5   A.  It would appear to me that one of the live rounds was

6   sitting behind a spent shell casing.  I can't tell from the

7   photo.  I can see the small live round which is the, probably

8   the .25.  The .9, and I don't remember specifically since I

9   don't see it clearly here, it was probably behind that spent

10  shell casing.

11  **BY MR. ROBERTS:**

12  Q.  The types of -- let's just get right down to it.  You

13  didn't find a firearm, did you, in that apartment?

14  A.  That's correct.

15  Q.  You didn't find a rifle in that apartment?

16  A.  That's correct.

17  Q.  You didn't find any object that could launch either of

18  those two bullets that you found, did you?

19  A.  We didn't find anything of that nature in plain view.

20  Q.  And when you were finished, then, you asked Mr. Johnson if

21  he would consent to you taking those items that were non

22  threatening.

23  A.  That's correct.

24  Q.  And he willingly said okie doke, basically?

25  A.  That's correct.

Case No. 14-CR-20119

                    Earl Douglas Robinson – Cross Examination
                             Wednesday, July 29, 2015

1    Q.  But he did say, though, he didn't want you to search his

2    cell phone, didn't he?

3    A.  That's right.  At that point in time, he said that he did

4    not want a search of the apartment, and I believe he said the

5    cell phone as well.

6    Q.  And in the protective sweep you didn't find any other

7    human being?

8    A.  That's correct.

9    Q.  And no crazy lunatic animal like a dog, an attack dog?

10   A.  That's correct.

11           **MR. ROBERTS:**  Thank you.  I have nothing further.

12           **MR. GOETZ:**  Nothing further from the government.

13           **THE COURT:**  Thank you.  You may step down and be

14   excused.

15           (Witness excused at 9:35 a.m.)

16           **MR. ROBERTS:**  Your Honor, may counsel approach

17   briefly?

18           (The following sidebar conference was held:)

19           **MR. ROBERTS:**  Just to be doubly sure, but also to

20   reiterate my objection to the admission of these items because

21   they don't pose a threat, didn't pose a threat, and based upon

22   the testimony here again, relevance and --

23           **THE COURT:**  I've already ruled on this.

24           **MR. ROBERTS:**  Yes, Your Honor.

25           **THE COURT:**  And you've raised your objection again,

                             Case No. 14-CR-20119

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1  too.  Okay.  We're done with this issue.

2          **MR. ROBERTS:**  Thank you, Your Honor.

3          (End of discussion at sidebar.)

4          **THE COURT:**  Are we recalling Mr. Council now?

5          **MR. GOETZ:**  Yes, Your Honor.

6          **MS. BROWN:**  United States recalls Antwuan Council.

7          **THE COURT:**  Mr. Council, I remind you that you're

8  still under oath.

9          **THE WITNESS:**  What?

10          **THE COURT:**  You're still under oath.

11          **THE WITNESS:**  Correct.

12          **MS. BROWN:**  May I proceed?

13          **THE COURT:**  You may.

14  (9:38 a.m.)

15

16          **DIRECT EXAMINATION (Continued)**

17  **BY MS. BROWN:**

18  Q.  Mr. Council, before we begin, I'm just going to ask you to

19  keep that mic up and keep your voice up so we can hear you.

20          Where we left off was with your arrest with the

21  gun.  Do you recall that?

22  A.  Correct.

23  Q.  I want to back up a little bit, though, to before you get

24  arrested with the gun in April of 2008.  Did you at some point

25  travel while you were a member of the Bounty Hunter Bloods to

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1   a different state?

2   A.  Yes.

3   Q.  What state?

4   A.  New York.

5   Q.  And who did you travel there with?

6   A.  Rellz.

7   Q.  And did you know Rellz' real name?

8   A.  No.

9   Q.  Do you know what rank Rellz was?

10  A.  YG.

11  Q.  And what was the purpose that you traveled to New York

12  with Rellz?

13  A.  To fight.

14  Q.  To fight who?

15  A.  Some people out there.

16  Q.  Were they members of the Bounty Hunter Bloods or members

17  of a gang, or what type of people were you going to fight?

18  A.  Different gang.

19          **THE COURT:**  I'm sorry, what?

20          **THE WITNESS:**  They different gang.

21  **BY MS. BROWN:**

22  Q.  A different gang?

23  A.  Correct.

24  Q.  Were they a rival gang of the Bounty Hunter Bloods?

25  A.  Yes.

Case No. 14-CR-20119

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1   Q.  And how do you travel out to New York?

2   A.  My mother car, truck.

3   Q.  You took your mother's truck?

4   A.  Correct.

5   Q.  And did you stay out in New York?

6   A.  No.

7   Q.  Did you spend the night?

8   A.  No.

9   Q.  How long did you go to New York for?

10  A.  We went there, he made a couple calls, nobody picked up,

11  we came back.

12  Q.  So sort of a long drive.

13  A.  Yes.

14  Q.  And this is somewhat of a technical question, but while

15  you were in New York, did you purchase anything?

16  A.  We ate, gas.

17  Q.  You got gas and you ate food?

18  A.  Yes.

19  Q.  I want to go back to April of 2008 where we left off, and

20  you said, I think where we left off is the police separated

21  the three of you, correct?

22  A.  Correct.

23  Q.  Your cousin started crying?

24  A.  Correct.

25  Q.  Is that right, and then you told the police the gun was

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1   yours?

2   A.  Yes, sir.

3   Q.  What happens after that?

4   A.  I got handcuffed and tooken down to the station.

5   Q.  When you got down to the station, where were you placed?

6   A.  In the holding cell.

7   Q.  And how long did you stay in that holding cell?

8   A.  It was days.

9   Q.  How were you feeling?

10  A.  Scared.

11  Q.  Did you have an opportunity to call any family members?

12  A.  Yes.

13  Q.  And who did you call?

14  A.  My girlfriend.

15  Q.  Did you call any of your blood relatives?

16  A.  Yes.  She called them on three-way.

17  Q.  Three-way?

18  A.  Yes.

19  Q.  And who did you speak with from your family?

20  A.  My sister.

21  Q.  Did you speak with your parents?

22  A.  No.

23  Q.  Why is that?

24  A.  My mother was, she was in the hospital on a ventilator.

25  Q.  And so you weren't able to speak with her?

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1    A.  Correct.

2    Q.  Did you instruct your sister to tell your mother what was

3    going on?

4    A.  Yes.

5    Q.  Did you speak with your father at that time, as well?

6    A.  Not at that time, no.

7    Q.  How were you feeling about telling your parents?

8    A.  Nervous, scared.

9    Q.  So as you're in that holding cell for, you said, a number

10   of days, what kind of things are running through your mind?

11   A.  The punishment I was going to get.

12   Q.  Punishment from the law, or punishment from someone else?

13   A.  My parents.

14   Q.  What else were you thinking about?

15   A.  Getting out of there, going home.

16   Q.  Did you have any regrets at that point?

17   A.  Yes.

18   Q.  What kind of regrets did you have?

19   A.  Joining the gang.

20   Q.  At some point while you're being held there are you

21   approached by a member of law enforcement, or was that after

22   you got moved somewhere?

23   A.  Yes.

24   Q.  When you were in the initial holding cell?

25   A.  Correct.

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1  Q.  And do you remember that law enforcement officer's name?

2  A.  Ju Ju.

3  Q.  Do you know if that was her real name, or like a nickname?

4  A.  Nickname.

5  Q.  And that's J-U J-U, correct?

6  A.  I think so.

7  Q.  And Ju Ju, was she a member of what law enforcement

8  agency?

9  A.  I forgot.

10  Q.  You forgot?

11  A.  Correct.

12  Q.  So when she approaches you, does she tell you why she's

13  coming to you?

14  A.  Yes.

15  Q.  What does she tell you about?  What does she want to talk

16  to you about, the topic, without telling us what she says?

17  A.  Trying to stop the gang.

18  Q.  Okay.  So she asks you about the gang?

19  A.  Yes.

20  Q.  What gang in particular?

21  A.  BHB.

22  Q.  Do you know how she knew to ask you about the BHB?

23  A.  My hat.

24  Q.  So that hat you told us about that you were wearing that

25  day, the one that said BHB on it?

Case No. 14-CR-20119

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1    A.  Correct.

2    Q.  When she asked you, how did you feel about talking to her?

3    A.  I felt nervous.

4    Q.  Did you talk to her the first time that Ju Ju came?

5    A.  Yes.

6    Q.  And did you tell her about your involvement in the gang?

7    A.  Yes.

8    Q.  What did she invite you to do, if anything, with respect

9    to assisting law enforcement?

10   A.  To call her once I got out.

11   Q.  She wanted you to call her once you got out, correct?

12   A.  Yes.

13   Q.  So at some point your case then proceeds, correct?

14   A.  Correct.

15   Q.  And you appear in court?

16   A.  Yes.

17   Q.  Do you remember what court you appeared in?

18   A.  In the county, Wayne County.

19   Q.  Wayne County?

20   A.  Yes.

21   Q.  And were you still in custody when you appeared in Wayne

22   County, or had you been let out on bond?

23   A.  That, I don't -- no, actually, I was there still.

24   Q.  You were still in custody?

25   A.  Yes.

Case No. 14-CR-20119

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1   Q.  And do you eventually plead guilty?

2   A.  Yes.

3   Q.  To what charge?

4   A.  HYTA.

5   Q.  Well, what was the crime?  Do you remember the name of the

6   crime?

7   A.  Carrying a concealed weapon.

8   Q.  So you plead guilty to carrying a concealed weapon,

9   correct?

10  A.  Yes.

11  Q.  You mentioned something called HYTA, right?

12  A.  Yes.

13  Q.  Is that H-Y-T-A, if you know?

14  A.  Yes.

15  Q.  And what do you understand HYTA to be?

16  A.  I had five hours of community service, I had to get my GED

17  or high school diploma, and I had to pay my fines off.

18  Q.  And you had to pay your fines?

19  A.  Yes.

20  Q.  Did that conviction also -- as part of your sentence were

21  you also placed on probation?

22  A.  Yes.

23  Q.  For how long?

24  A.  Two years.

25  Q.  Now, in terms of your understanding of HYTA, if you had

Case No. 14-CR-20119

Antwuan Council - Direct Examination
Wednesday, July 29, 2015

1   gotten into any trouble or violated your probation or

2   committed crimes, what would have happened?

3   A.  I would have violated.

4   Q.  You would have violated HYTA?

5   A.  Yes.

6   Q.  And was your understanding that if you completed HYTA, you

7   would then not have a conviction?

8   A.  Correct.

9          **THE COURT:**  Could you ask him if he knows what HYTA

10   stands for, for the purposes of the jury, please?

11   **BY MS. BROWN:**

12   Q.  Do you know what HYTA stands for?

13   A.  No, I do not.

14   Q.  So after the conviction or after you're sentenced, do you

15   remember when that was, by date?

16   A.  No.

17   Q.  After you're sentenced, do you then follow up on Ju Ju's

18   instructions to come see her?

19   A.  Correct.

20   Q.  And you come see her.  Where do you meet with her?

21   A.  We met on a street called Greenview.

22   Q.  Greenview?

23   A.  Yes.

24   Q.  And is that in your neighborhood?

25   A.  Yes.

Case No. 14-CR-20119

Antwuan Council - Direct Examination
Wednesday, July 29, 2015

1   Q.  And that first meeting, is she alone or is she with

2   somebody else?

3   A.  I can't, can't remember.

4   Q.  At some point does she bring the ATF in, as well?

5   A.  Yes.

6   Q.  And do you remember who that person was?

7   A.  Donovan.

8   Q.  Donovan was his first name?

9   A.  That, I don't know.

10  Q.  But you just called him Donovan, correct?

11  A.  Correct.

12  Q.  And you understand him to be an ATF agent?

13  A.  Yes.

14  Q.  Did you meet with him and Ju Ju once, or more than one

15  time, before starting to work with the ATF?

16  A.  One time.

17  Q.  And what did you discuss at that meeting?

18  A.  What meeting?  You talking about with Ju Ju or --

19  Q.  Well, you met once with Ju Ju first, correct?

20  A.  Correct.

21  Q.  And this is outside of the jail cell, correct?

22  A.  Correct.

23  Q.  And don't tell me what you said, but what types of things

24  did you discuss?

25  A.  Things that was taking place in the BHB group.

Case No. 14-CR-20119

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1    Q.  And so after that meeting, does she then bring somebody

2    else to meet with you?

3    A.  Yes.

4    Q.  And that's Donovan?

5    A.  Correct.

6    Q.  And then what types of things do you talk to Donovan

7    about?

8    A.  The same thing.

9    Q.  At some point, does the ATF approach you with signing up

10   or helping, having you help them work?

11   A.  Correct.

12   Q.  And was that somewhat of a lengthy process, or was it just

13   they signed you up and you went out on the street?

14   A.  I signed paper, I got pictures tooken of my tattoos and

15   everything, fingerprinted.

16   Q.  You got fingerprinted?

17   A.  Correct.

18   Q.  And did they give you anything as part of your, like

19   equipment to use while -- initially while you were signed up

20   to work?

21   A.  Not at first.

22   Q.  What was your initial responsibility, then, before you got

23   any kind of equipment?

24   A.  I was to call Donovan if anything happened and tell him

25   different things was taking part.

Case No. 14-CR-20119

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1    Q.  "Anything" meaning criminal activity?

2    A.  Correct.

3    Q.  Was it also part of your instruction from the ATF that you

4    weren't to commit any crimes yourself, correct?

5    A.  Correct.

6    Q.  So about how long did this go on where you would observe

7    what was going on with the BHB and then report back to

8    Donovan?

9    A.  I don't recall the timeframe.

10   Q.  But it was more than a week?

11   A.  Yes.

12   Q.  More than a few weeks?

13   A.  Yeah.

14   Q.  Did there come a time, then, where they gave you a

15   telephone?

16   A.  Yes.

17   Q.  More than one telephone?

18   A.  No, one telephone.

19   Q.  Okay.  And what was the purpose of that telephone?  What

20   did it do, if you know?

21   A.  It taped the calls.

22   Q.  Did it tape every call you made?

23   A.  Yes.

24   Q.  So you didn't have control over when it taped some calls

25   and when it didn't, correct?

Case No. 14-CR-20119

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1    A.  Correct.

2    Q.  Did your parents know what you were doing?

3    A.  No.

4    Q.  Were you allowed to tell them based on your agreement with

5    the ATF?

6    A.  No.

7    Q.  Was it also part of your agreement with the ATF that as

8    you would report back to them, depending on the week, you

9    would receive some payment in return for the work you did?

10   A.  Correct.

11   Q.  Do you remember exactly how much?

12   A.  It depend on the days.

13   Q.  It would depend on what type of work you did?

14   A.  Yes.

15   Q.  What types of things were you expected to do, in addition

16   to what you've told us, in terms of reporting back to Donovan

17   about the activities of the BHB?  What types of things were

18   you expected to do once you received that phone, telephone?

19   A.  To make sure I was making calls, getting people to talk.

20   Q.  Okay.  To see what was going on?

21   A.  Correct.

22   Q.  At some point, did you make Donovan aware that you were

23   going to -- or that there was a meeting, a Blood-in that was

24   going to happen?

25   A.  Correct.

Case No. 14-CR-20119

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1    Q.  And when you told him that, did he give you any type of

2    equipment?

3    A.  Yes.

4    Q.  What did he give you?

5    A.  A shirt with a camera in it.

6    Q.  And do you recall where the camera was in the shirt?

7    A.  In the button.

8    Q.  In a button?

9    A.  Correct.

10   Q.  And was that a button or a camera that recorded audio and

11   visual?

12   A.  Yes.

13   Q.  Do you remember when this was?

14   A.  No.

15   Q.  So before the meeting, you -- so you called Donovan about

16   this, correct?

17   A.  Correct.

18   Q.  And then he gives you the shirt, correct?

19   A.  Correct.

20   Q.  And then where do you go after he gives you that shirt?

21   A.  To the Blood-in.

22   Q.  Was there some place that you met with other members

23   before going to the Blood-in?

24   A.  That, I cannot recall.

25   Q.  Do you remember who you met up with initially before you

Antwuan Council - Direct Examination
Wednesday, July 29, 2015

1   went to the Blood-in?

2   A.  Not everybody, but some people, yeah.

3   Q.  So who were some of those people?

4   A.  Banger, Glock, 4-5.

5   Q.  Glock and 4-5 are two separate people, correct?

6   A.  Correct.

7   Q.  Now, when you went to the Blood-in, do you recall where

8   that was located?

9   A.  On the street right around the corner from me which is

10  called Stahelin.

11  Q.  Stahelin?

12  A.  Correct.

13  Q.  Is that a house where somebody lived or was --

14  A.  No.

15  Q.  It was vacant?

16  A.  Yes.

17  Q.  Was that a house where BHBs would hang out quite a bit?

18  A.  Yes.

19  Q.  I'm going to show you, you've seen this video, this audio

20  visual of the meeting, correct?

21  A.  Correct.

22  Q.  And the Blood-in?

23  A.  Correct.

24  Q.  I'm going to show you some clips of that, of what's

25  already been admitted as Government's Exhibit 24, and then

Case No. 14-CR-20119

Antwuan Council - Direct Examination
Wednesday, July 29, 2015

1   after each clip, we'll stop, and I'm going to ask you a few

2   questions, okay?

3   A.  Okay.

4            **MS. BROWN:**  If we could see 24A1, please.

5            (Government Exhibit 24A1, videotape, was played.)

6   **BY MS. BROWN:**

7   Q.  Now, were you able to see that video?

8   A.  Yes.

9   Q.  Did you note some numbers at the bottom of the screen?

10  A.  Yes.

11  Q.  That look like a date?  Well, they read 11/22/2008?

12  A.  Correct.

13  Q.  Did you see that?  Does that sound about right, that that

14  would have been the date that this occurred?

15  A.  Yes.

16  Q.  Now, in there, there's initials AC.  Do you know, was

17  that -- when there were certain words across the screen, do

18  you recognize that voice as belonging to somebody?

19  A.  Yes.

20  Q.  Whose voice?

21  A.  Me.

22  Q.  Did you also see initials DB?  Do you know who was talking

23  when DB was on the screen?

24  A.  D-Red.

25  Q.  You knew him as D-Red?

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1    A.  Yes.

2    Q.  Did you know his given name?

3    A.  No.

4    Q.  One of the things mentioned there -- well, let's back up.

5    Could you tell where you were, looking at that video?

6    A.  Yes.

7    Q.  Where?

8    A.  In the alley.

9    Q.  Was it near this house on Stahelin you mentioned before?

10   A.  Yes.

11   Q.  And did you see the word "chopper" up there?

12   A.  Correct.

13   Q.  What's your understanding what chopper means?

14   A.  AK.

15   Q.  What's an AK?

16   A.  It's a rifle, type of gun.

17   Q.  There was some discussion of meetings.  Did you recall

18   reading that?

19   A.  Yes.

20   Q.  What was your understanding of what that was?

21   A.  Meetings is when we meet up and talk.

22   Q.  And did that happen with some frequency while you were a

23   BHB?

24   A.  Yes.

25   Q.  There was also some discussion for money.  What was that

Case No. 14-CR-20119

Antwuan Council - Direct Examination
Wednesday, July 29, 2015

1    in relationship to?

2    A.  To purchase the rifle.

3    Q.  The chopper?

4    A.  Yes.

5              **MS. BROWN:**  If we could see 24A2, please.

6              (Government Exhibit 24A2, videotape, was played.)

7    **BY MS. BROWN:**

8    Q.  What does Western refer to in there?

9    A.  That's a school.

10             **THE COURT:**  I'm sorry, what?

11             **THE WITNESS:**  That's a school.

12   **BY MS. BROWN:**

13   Q.  And what are Brightmoor, I'm not going to say the word,

14   but N's?

15   A.  Brightmoor Cripps.

16   Q.  Was that a gang you were, BHB was friendly with or

17   unfriendly with?

18   A.  Unfriendly.

19   Q.  And so what are you guys discussing in that clip?

20   A.  About fighting.

21   Q.  And what does that have to do with the school Western?

22   A.  There's some people up there that they wanted to fight.

23   Q.  Was that common or uncommon for there to be fights with

24   rival gangs at schools?

25   A.  Common.

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1   Q.  And why is that?

2   A.  Because gangs, some gangs was in school still, some of the

3   people still went to school.

4          **MS. BROWN:**  If we could see 24A3, please.

5          (Government Exhibit 24A3, videotape, was played.)

6          **MS. BROWN:**  Could we pause it here, please.

7   **BY MS. BROWN:**

8   Q.  Before we get more into this, where are we right now?

9   What are we looking at on A3?

10  A.  We in the house.

11  Q.  And this is the house on Stahelin?

12  A.  Correct.

13  Q.  And what is about to happen here?

14  A.  The Blood-in.

15  Q.  And do you know of whom?

16  A.  It was a girl.

17  Q.  It was a Blood-in of a female member?

18  A.  Correct.

19         **MS. BROWN:**  Okay.  Go ahead, thank you.

20         (Government Exhibit 24A3, videotape, was played.)

21  **BY MS. BROWN:**

22  Q.  So I want to -- first of all, what did we just watch?

23  A.  Blood-in.

24  Q.  Of the female?

25  A.  Correct.

Case No. 14-CR-20119

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1    Q.  And I know you told us that, when you joined, you were

2    expected to have your hand tied or hold a flag while people

3    counted, correct, or while you were beat up, correct?

4    A.  Correct.

5    Q.  Did they count while they beat you up?

6    A.  They set alarm clock.

7    Q.  Is it fair to say that sometimes an alarm was set and

8    sometimes people counted, as here?

9    A.  Yes.

10   Q.  There was some discussion of red light and green light.

11   Tell us about that.

12   A.  Red light mean go -- mean stop.  Green mean go.

13   Q.  So periodically the people fighting were expected to stop

14   or go?

15   A.  That's the first time that I saw that, only time I saw

16   that.

17   Q.  Did the female have anybody fighting on her side?

18   A.  No.

19   Q.  Now, there were some directions in the beginning, or

20   statements in the beginning talking about, "If you drop it, we

21   start over," I believe?

22   A.  Yes.

23   Q.  What are they talking about there?

24   A.  The count, the clock will start over.

25   Q.  If she drops what?

Case No. 14-CR-20119

Antwuan Council - Direct Examination
Wednesday, July 29, 2015

1  A.  The flag.

2  Q.  There was also some discussion of closing hand.  What does

3  that mean?

4  A.  Close they hand with the flag in it.

5  Q.  And was there also any -- was there any instruction about

6  how she should be hit?

7  A.  That, I don't recall.

8  Q.  There was some mention of something called the Starting 5.

9  Do you know what Starting 5 is?

10  A.  That's another gang.

11  Q.  And was there some commotion when that gang name was

12  brought up?

13  A.  Yes.

14  Q.  Why?

15  A.  That's a rival gang.

16  Q.  And if you recall from the video or even from being there,

17  what do you remember she indicated about the Starting 5?

18  A.  Her brother was there, part of there.

19          **MS. BROWN:**  If we could see 24A4, please.

20          (Government Exhibit 24A4, videotape, was played.)

21  **BY MS. BROWN:**

22  Q.  Were there any females hitting her, or were they just

23  males?

24  A.  Males.

25  Q.  How did you feel when you were watching that?

Case No. 14-CR-20119

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1    A.  It was wrong.

2    Q.  And did you know at that time it was?

3    A.  Yes.

4    Q.  Could you have stopped it then?

5    A.  No.

6    Q.  Why is that?

7    A.  Because she was getting down.

8    Q.  And at this time, you were helping the ATF, is that

9    correct?

10   A.  Correct.

11   Q.  What might have happened if you had told them to stop

12   blooding her in?

13          **MR. ROBERTS:**  Objection, speculation.

14   **BY MS. BROWN:**

15   Q.  If you know.

16          **THE COURT:**  If you know.

17   **BY MS. BROWN:**

18   Q.  Let me ask it this way:  What did you think might happen

19   if you told them to stop blooding her in?

20   A.  They would ask me why.

21   Q.  And were you concerned about that?

22   A.  Yes.

23          **MS. BROWN:**  If we could see 24A5 please.

24          (Government Exhibit 24A5, videotape, was played.)

25

Case No. 14-CR-20119

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1    **BY MS. BROWN:**

2    Q.  Was the clip that we just looked at the same day as the

3    Blood-in?

4    A.  Correct.

5    Q.  Was that after the Blood-in?

6    A.  Correct.

7    Q.  I'm going to ask you some questions about what was

8    discussed.  There was some mention of a pot.  You told us a

9    little bit about that yesterday as well.  But they were

10   talking about, I believe, 20 pots or $20 pots.  What's a $20

11   pot?

12   A.  $20 pot, everybody chip in $20.

13   Q.  And was this done at meetings?

14   A.  What do you mean?

15   Q.  Was the $20 pot, the $20 collection, were they asking for

16   it at this meeting, correct?

17   A.  No, no.

18   Q.  This was for what, in the future?

19   A.  Yeah, future.

20   Q.  There's some mention of a treasurer.  What was that about?

21   A.  Someone to keep the money, trustworthy.

22           **THE COURT:**  To keep the what?

23           **THE WITNESS:**  Keep the money.

24           **THE COURT:**  The bling?

25           **THE WITNESS:**  The money.

Case No. 14-CR-20119

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1    **BY MS. BROWN:**

2    Q.  And also, a discussion again of a chopper, which you told

3    us is like an AK, correct?

4    A.  Correct.

5    Q.  And what did that have to do, if anything, with the money?

6    A.  They was trying to purchase it.

7    Q.  Was that why they were trying to collect the money?

8    A.  Correct.

9    Q.  Toward the end, one of the individuals mentioned something

10   about a burner and some money.  What was that about?

11   A.  It's a gun.

12   Q.  What is a gun?

13   A.  A burner.

14   Q.  A burner?  What type of gun?

15   A.  Any type of gun.

16   Q.  So it's just a generic phrase for a gun?

17   A.  Yes.

18   Q.  And what did the money, again, have to do with that?

19   A.  Purchase it.

20            **MS. BROWN:**  If we could see 24A6, please.

21            (Government Exhibit 24A6, videotape, was played.)

22   **BY MS. BROWN:**

23   Q.  We opened that clip, that's your voice, correct?

24   A.  Correct.

25   Q.  And you mentioned goons.  What are goons?

Case No. 14-CR-20119

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

 1   A.  Like how can I describe it?  Somebody isn't scared of

 2   nothing.

 3   Q.  Who isn't scared of anything?

 4   A.  Yeah.

 5   Q.  Who are you talking about there?

 6   A.  The Schoolcraft line.

 7   Q.  And is that line part of the BHB, or something else?

 8   A.  Yes.

 9   Q.  It's part of the BHB?

10   A.  Correct.

11   Q.  That wasn't your line, though, correct?

12   A.  No.

13   Q.  But did you work with that line?

14   A.  Yes.

15   Q.  And did you all have the same leadership?

16   A.  Yes.

17   Q.  You also mentioned banging.  What's banging?

18   A.  Fighting.

19   Q.  Did you recognize anybody in that video that you saw?  I

20   know the camera kind of pans around.  Can you identify any

21   individuals in that?

22   A.  Glock.

23   Q.  Glock, did you know that person's real name?

24   A.  David Gay.

25   Q.  Anybody else?

Case No. 14-CR-20119

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1   A.  B-Red.

2   Q.  You recognize B-Red as well?

3   A.  Yes.

4   Q.  That's the person whose initials you identified when their

5   voice is going on, the initials DB next to it?

6   A.  Correct.

7   Q.  Now, there was some discussion at the end, there was a

8   female voice asking some questions, and you and others were

9   giving some, it sounds like instructions, is that a fair

10  statement?

11  A.  Yes.

12  Q.  About cuz and crib.  What is that about?

13  A.  The C, she couldn't use.

14  Q.  So were you essentially instructing her?

15  A.  Correct.

16  Q.  And why, again, are you not supposed to use the C?

17  A.  Because it's for Cripps.

18  Q.  So you replace that with a what?

19  A.  A B.

20  Q.  Is that why you told her to say brib instead of crib?

21  A.  Correct.

22          **MS. BROWN:**  Let's go to 24B1.

23          (Government Exhibit 24B1, videotape, was played.)

24  **BY MS. BROWN:**

25  Q.  One of the things mentioned was something called a Hunter

Case No. 14-CR-20119

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1    name.  What's a Hunter name?

2    A.  A Blood name.

3    Q.  Like for you, you said yours was Brazy-T?

4    A.  Correct.

5    Q.  There was a name mentioned, D-Red.  Do you recall that?

6    A.  Yes.

7    Q.  Is that the same as B-Red, or different?

8    A.  Different.

9    Q.  Who is D-Red, if you know?

10   A.  A different person.  No, I don't.

11          **THE COURT:**  I'm sorry, I didn't hear the answer.

12   **BY MS. BROWN:**

13   Q.  Can you repeat your answer?

14   A.  It's a different person.  I don't know.

15   Q.  Did you know, were they Bounty Hunter Bloods also?

16   A.  I don't recall.

17   Q.  There was some mention of, also, violating.  Do you

18   remember that?

19   A.  Yes.

20   Q.  What were you guys talking about there?

21   A.  It's like a punishment.

22   Q.  But for what purpose in this context were you discussing

23   somebody would be violated, for what?

24   A.  Not coming to the meetings.

25   Q.  There was also a discussion of capos and lieutenants and

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1    people watching over.

2    A.  Correct.

3    Q.  What was that about?

4    A.  B-Red was coming to the Seven Mile side to look at the

5    lieutenants, making sure they doing they jobs.

6    Q.  What was B-Red's rank at that time?

7    A.  A capo.

8    Q.  So was that above lieutenant?

9    A.  Yes.

10   Q.  So he was coming to Seven Mile to make sure the

11   lieutenants were doing what?

12   A.  They jobs.

13   Q.  And what were their jobs?

14   A.  Making sure they having meetings, making sure that they

15   soldiers out tagging.

16   Q.  Was that a common arrangement within the Bounty Hunter

17   Bloods?

18   A.  Yes.

19   Q.  There was some mention of Crabs.  What are Crabs?

20   A.  Cripps.

21   Q.  And what did the discussion toward the end about shooting

22   have to do?  What did that concern, do you recall?

23   A.  He said that we don't have guns, and if he -- if he was on

24   a different side of the field, he would be shooting at us.

25   Q.  And that was B-Red talking?

Case No. 14-CR-20119

Antwuan Council - Direct Examination
Wednesday, July 29, 2015

1    A.  Yes.

2    Q.  Is that why you all were discussing getting more guns

3    then?

4    A.  Yes.

5              **MS. BROWN:**  If we could see B2, please.

6              (Government Exhibit 24B2, videotape, was played.)

7    **BY MS. BROWN:**

8    Q.  Okay.  In the beginning of that clip -- DB, you said

9    that's B-Red, correct?

10   A.  Correct.

11   Q.  He's talking about what the point of banging is.  What

12   does he mean by that?

13   A.  Representing the group.

14   Q.  BHB?

15   A.  Yes.

16   Q.  At some point, B-Red also mentioned something about

17   grindin'.  What's grindin'?

18   A.  Hustlin'.

19   Q.  Hustling, what's hustling mean?

20   A.  Selling drugs.

21   Q.  Anything else?

22   A.  Whatever you got to do.

23   Q.  Whatever you got to do to what?

24   A.  To get some money.

25   Q.  Get money?

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1   A.  Yeah.

2   Q.  There's also some mention of bows, B-O-W-S.  What are

3   bows?

4   A.  Weed.

5   Q.  Marijuana?

6   A.  Yes.

7   Q.  Later on in the clip, B-Red mentions about people getting

8   jumped yesterday.  What was that about?

9   A.  Some different gangs jumped some members of the BHB.

10  Q.  Were these types of disputes common or uncommon within the

11  Bounty Hunter Bloods?

12  A.  Common.

13  Q.  What's an E-7?

14  A.  East Side Seven Mile.

15  Q.  And there was some discussion about stuff being crossed

16  out.  What does that mean?

17  A.  Tagged.

18          THE COURT:  I'm sorry?

19          THE WITNESS:  Tagged.

20  BY MS. BROWN:

21  Q.  A tag, is that graffiti?

22  A.  Yes.

23  Q.  So tell us about that.  What does that mean?

24  A.  When we spray paint like BHB, CK, our Hunter name, things

25  like that.

Case No. 14-CR-20119

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1  Q.  And what are you discussing with respect to that?

2  A.  When people cross it out, disrespect.

3  Q.  And what does that -- it shows what to you when they cross

4  it out?

5  A.  Disrespecting.

6  Q.  And if -- what do you do in response, or what are Bounty

7  Hunter members expected to do in response when there's

8  disrespect?

9  A.  Cross it back out, retag.

10  Q.  And is that something that members did?

11  A.  Yes.

12  Q.  Is that something you did as a member?

13  A.  Yes.

14  Q.  There's also some discussion of MOB.  What's MOB?

15  A.  A different gang.

16  Q.  And was that a gang that the Bounty Hunter Bloods got

17  along with, or didn't get along with?

18  A.  Didn't.

19  Q.  Were there disputes between the Bounty Hunter Bloods and

20  the MOB?

21  A.  Yes.

22          **MS. BROWN:**  If we could see 24B3, please.

23          (Government Exhibit 24B3, videotape, was played.)

24  **BY MS. BROWN:**

25  Q.  Before we get into this clip, I want to go back to 24B2

Case No. 14-CR-20119

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1   for a moment.  There was some mention of everybody needing to

2   have a burner right around the time they were talking about

3   marijuana and bows.  What was the relationship between that,

4   between everybody needing to have a burner and bows of

5   marijuana?

6   A.  A gun.

7   Q.  Well, what was the relationship between selling drugs and

8   getting burners?

9   A.  That way you can take the cash to -- money to purchase the

10  gun.

11  Q.  The money you made from selling dope?

12  A.  Yes.

13  Q.  So let's go back to 24B3 which we've just seen.  There's

14  some discussion in the beginning of beefing.  What's beefing?

15  A.  Beefing is once you doesn't like each other.

16  Q.  So is that a reference to fights?

17  A.  Yes.

18  Q.  There's also a reference to Foe Life.  What's Foe Life?

19  A.  That's a different gang.

20  Q.  Is that the gang that the female who was Blood-in brought

21  up, or is that different?

22  A.  That's different.

23  Q.  And then AG's were brought up near MOB.  What does that

24  mean?

25  A.  That's a different gang also.

Case No. 14-CR-20119

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1   Q.  AG's are?

2   A.  Yes.

3   Q.  A rival gang?

4   A.  Yes.

5   Q.  Toward the end, there was discussion of giving her the

6   lit.  What does that mean?

7   A.  Literature with the information of different things, the

8   bylaws.

9   Q.  Was that the same type of information you received when

10  you became a member?

11  A.  Yes.

12  Q.  And what was she expected to do with that when she

13  received it?

14  A.  To read it, know it.

15          **MS. BROWN:**  If we could look at our last clip of

16  this.  It's 24B4.

17          (Government Exhibit 24B4, videotape, was played.)

18

19  **BY MS. BROWN:**

20  Q.  Early on, there's some discussion about first and second.

21  What does that mean?

22  A.  First and second?

23  Q.  What does that refer to?

24  A.  I don't recall.

25  Q.  Okay.  What are you guys talking about when you're talking

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1    about rank and soldiers?

2    A.  Capos, capos and lieutenants and soldiers.

3    Q.  And at one point DB says something about there not being a

4    lot of soldiers to coach.  What does that mean?

5    A.  It's not enough soldiers once you first get in.

6    Q.  Who is supposed to coach the soldiers?

7    A.  Lieutenants.

8    Q.  And by coach, what do you mean?

9    A.  Show 'em what to do.

10   Q.  Early on, you're talking about burners, is that right?

11   A.  Correct.

12   Q.  What are you talking about with that?

13   A.  Guns.

14   Q.  What about them specifically?

15   A.  Getting them, having them.

16   Q.  For what purpose?

17   A.  For we can have protection.

18   Q.  You told us earlier that one of your responsibilities with

19   the ATF was to keep them sort of aware of what was going on

20   with the Bounty Hunter Bloods, correct?

21   A.  Correct.

22   Q.  Did that include potential crimes?

23   A.  Correct.

24   Q.  Did there come a time in August of 2008 where you were

25   part of an arrest, essentially?

Case No. 14-CR-20119

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1   A.  Correct.

2   Q.  And tell us about that.

3   A.  I met with Donovan.  He gave me the shirt to wear.

4   Q.  Let me stop you right there.  Did you reach out to Donovan

5   to ask for the shirt?

6   A.  No, I called him and told him that ASAP wanted to go and

7   do a robbery.

8   Q.  Did you say ASAP?

9   A.  ASAP, correct.

10  Q.  A-S-A-P?

11  A.  Correct.

12  Q.  Do you know ASAP's given name?

13  A.  No.

14  Q.  Was ASAP a gang member?

15  A.  Yes.

16  Q.  So how far in advance of this robbery did you know that

17  ASAP wanted to do this?

18  A.  It had to be a day or two.

19  Q.  So when you get that information, what do you do with it?

20  A.  I called Donovan.

21  Q.  And what happened?

22  A.  We set up a meet time.  I met him, we got the shirt, and

23  they followed me while we went to pick up ASAP, and then I was

24  gonna go pick up the gun.

25  Q.  So who was driving?

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1   A.  I was driving.

2   Q.  And you said that the ATF was following you?

3   A.  Yes.

4   Q.  When you drove your car, did you go to pick people up, or

5   were there people with you that met you at your house?

6   A.  I went to pick them up.

7   Q.  How many people did you pick up?

8   A.  Two people.

9   Q.  ASAP and who else?

10  A.  Renegade.

11  Q.  And was that a male or female?

12  A.  Female.

13  Q.  And was she a member?

14  A.  Yes.

15  Q.  Who was driving?

16  A.  I was driving.

17  Q.  And where was ASAP?

18  A.  In the passenger seat.

19  Q.  And you said you went to pick up a gun?

20  A.  Yes.

21  Q.  Where did you go to pick up the gun?

22  A.  Off Schoolcraft.

23  Q.  Do you know, was it somebody's house?

24  A.  Yes.

25  Q.  Whose house?

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

 1   A.  The house, I don't know.

 2   Q.  And was this a house where somebody lived?

 3   A.  Yes.

 4   Q.  Who told you to go to that house?

 5   A.  ASAP.

 6   Q.  And did you go inside the house?

 7   A.  No.

 8   Q.  Did you wait outside?

 9   A.  Yes.

10   Q.  If you know, was there more than one gun stored at that

11   location?

12   A.  That, I don't know.

13   Q.  So did you wait in the car while ASAP went in to get the

14   gun?

15   A.  The person, he walked outside with it.

16   Q.  And brought the gun?

17   A.  Yes.

18   Q.  Do you remember what kind of gun it was?

19   A.  No.

20   Q.  No, you don't?

21   A.  No, I don't.

22   Q.  Was it a big gun or a small gun?

23   A.  A big gun.

24   Q.  And where were you going to go with that gun?

25   A.  That, I don't know.

Case No. 14-CR-20119

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1   Q.  Was it a business or a person?

2   A.  A person.

3   Q.  So once you pick up the gun, what happens next?

4   A.  We circle back, got on Schoolcraft, and we got pulled

5   over.

6   Q.  Who did you get pulled over by?

7   A.  Detroit Police.

8   Q.  Detroit Police?

9   A.  Uh-huh.

10  Q.  That's yes?

11  A.  Yes.

12  Q.  I just need it for the sake of the court reporter.

13  A.  Okay.

14  Q.  Did ATF do anything?

15  A.  They was part of it.

16  Q.  But when you were arrested, they didn't say anything, like

17  to give you away about what you were doing, correct?

18  A.  No.

19  Q.  But you're arrested, correct?

20  A.  Correct.

21  Q.  And where is the gun when you're arrested?

22  A.  In the trunk.

23  Q.  And are all three of you arrested at that point?

24  A.  Yes.

25  Q.  Are you later released?

Case No. 14-CR-20119

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1   A.  Yes.

2   Q.  At some point, as part of your role with ATF, did you

3   obtain a copy of the bylaws?

4   A.  Yes.

5   Q.  And who did you obtain those from?

6   A.  B-Rice.

7   Q.  B-Rice?

8   A.  Yes.

9   Q.  Is that -- do you know that person's given name?

10  A.  No.

11  Q.  Was that person a member of the Bounty Hunter Bloods?

12  A.  Yes.

13  Q.  And what did you do with the bylaws when he gave them to

14  you?

15  A.  Gave them to Donovan.

16  Q.  I'm sorry?

17  A.  Gave them to Donovan.

18  Q.  Do you know B-Rice's rank?

19  A.  No.

20  Q.  I'm going to direct you to the tab in front -- in the

21  binder in front of you, number 15, and ask you to look at the

22  pages behind that, please.

23          Have you looked at those?

24  A.  Yes.

25  Q.  For the record, they are labeled 15A through 15I.  Do you

Case No. 14-CR-20119

Antwuan Council – Voir Dire Examination
Wednesday, July 29, 2015

1    recognize those pages?

2    A.   Yes.

3    Q.   And what do you recognize them to be?

4    A.   The bylaws.

5    Q.   Are they a copy of them?

6    A.   Yes.

7    Q.   Did you keep the original set, or did you give -- did you

8    give the originals to Donovan to keep, or did you have to take

9    them back to B-Rice?

10   A.   That, I don't know.

11   Q.   You don't know?

12   A.   Yeah.

13   Q.   But this is a copy of what you received, correct?

14   A.   Correct.

15           **MS. BROWN:**  I'd move for the admission of 15 in its

16   entirety at this time.

17           **MR. GUREWITZ:**  I object, Your Honor, and I'd like

18   to voir dire him.

19           **THE COURT:**  All right.

20   (10:37 a.m.)

21                 **VOIR DIRE EXAMINATION**

22   **BY MR. GUREWITZ:**

23   Q.   Good morning, Mr. Council.

24   A.   Good morning.

25   Q.   First question is do you remember when you got the

Case No. 14-CR-20119

Antwuan Council - Voir Dire Examination
Wednesday, July 29, 2015

1   document that you've just identified?

2   A.  No, I don't.

3   Q.  It happened sometime after you started cooperating with

4   the ATF, is that right?

5   A.  Well, I got two sets.  I got a set once I first joined,

6   and then they wanted a copy of it and I didn't have it, so I

7   got another set.

8   Q.  I'm asking you whether or not this document you just

9   identified you got sometime after you started working with the

10  ATF.

11  A.  Correct.

12  Q.  And at some time before you stopped in February of 2009,

13  is that right?

14  A.  Correct.

15  Q.  The person you got it from was, his last name was Rice,

16  R-I-C-E?

17  A.  B-Rice.

18  Q.  I'm sorry?

19  A.  That's his nickname.

20  Q.  And did you observe B-Rice prepare this document?

21  A.  He just gave it to me.

22  Q.  Now, did you see him write any of it down himself?

23  A.  No.

24  Q.  Do you know actually who -- this is all in handwriting,

25  isn't it?

Antwuan Council – Voir Dire Examination
Wednesday, July 29, 2015

1   A.  Correct.

2   Q.  Do you know whose handwriting it is?

3   A.  No, I do not.

4   Q.  Did you have an opportunity at any time before you gave it

5   to an agent from the ATF to compare it to any other copy of

6   what you knew to be bylaws?

7   A.  No, I didn't.

8   Q.  You said that you had received something else, another

9   document that you called bylaws sometime before?

10          **MS. BROWN:**  Your Honor, object at this point.  If

11   Mr. Gurewitz is attempting to challenge the authenticity of

12   the document, that's fine, but I think we're going a little

13   far afield at this point.

14          **THE COURT:**  I agree.

15          **MR. GUREWITZ:**  That's all I'm asking about, Your

16   Honor, is authenticity.  I want to see if he knows this to be

17   what he had seen before.  That's what I was attempting to ask.

18          **THE COURT:**  Go ahead.

19   **BY MR. GUREWITZ:**

20   Q.  You had received a document sometime before this, is that

21   right?

22   A.  Correct.

23   Q.  And had you memorized that?

24   A.  Not all of it.

25   Q.  Any of it?

Case No.  14-CR-20119

Antwuan Council – Voir Dire Examination
Wednesday,July 29, 2015

1  A.  Yes.

2  Q.  And this document, then, that you've identified here this

3  morning that has numbers on it, starting with 15A, is this the

4  same one as you had seen before?

5  A.  Yes.

6           **MR. GUREWITZ:**  Your Honor, I would object to this

7  at the present time because he doesn't know who prepared this,

8  how it was prepared, and even though he says it's like the one

9  he had seen before, there's nobody who says that this in fact

10 represents what is being called bylaws.

11          **THE COURT:**  Overruled.

12          (Government's Exhibit 15 received into evidence.)

13          Maybe it's a good time to take a break.  We'll take

14 20 minutes.

15          (Jury out 10:44 a.m.)

16          (Recess taken 10:44 a.m. until 11:05 a.m.)

17          **THE COURT:**  Ready?

18          (Jury in 11:06 a.m.)

19          **THE COURT:**  Be seated.  Before we proceed, let me

20 just give you the schedule.  I had this printed out and you'll

21 each have a copy of it.  Carol will leave it on the table so

22 you can take it before you leave.

23          We'll do a full day tomorrow.  By full day, I mean

24 we'll leave at 4:00 or as close to 4:00 as possible.  We may

25 spend five minutes after, whatever, to try to finish up a

Case No.  14-CR-20119

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1    witness, but we'll try to leave as close to 4:00 as possible.

2         No court on Friday this week.  Next week, we'll do

3    full days every day but Wednesday.  Wednesday will be a half

4    day.  Kind of moved everything from other afternoons all to

5    that same day.  And the following week, that's the week of

6    August 10th, we'll do full days every day with the possible

7    exception of Friday, depending on how we're going.

8         Thank you all for accommodating the change.

9                   **RESUME DIRECT EXAMINATION**

10   **BY MS. BROWN:**

11   Q.  Mr. Council, I believe where we left off was with the

12   bylaws, is that correct?

13   A.  Correct.

14   Q.  I believe you indicated that those bylaws that you just

15   looked at in the binder was a copy of the same bylaws that you

16   actually were given when you joined, correct?

17   A.  Correct.

18        **MS. BROWN:**  They have been received, is that

19   correct, Your Honor?

20        **THE COURT:**  Yes.

21   **BY MS. BROWN:**

22   Q.  If you could look at 15F, please.  Enlarge the top

23   portion, please.  Can you read what's at the top of that page?

24   A.  Hunna's Knowledge.

25   Q.  And that's spelled H-U-N-N-A, correct?

Case No. 14-CR-20119

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1    A.  Correct.

2    Q.  Is that another word for Hunters?

3    A.  Yes.

4    Q.  And what are we looking at listed below that?

5    A.  The meaning of each flag.

6    Q.  And flags are bandannas?

7    A.  Correct.

8    Q.  If we could go down to number 4.  Can you read to yourself

9    what's listed behind that?

10            What does that mean to you?  Is that familiar to

11   you, the origins of the gang?

12   A.  I forgot.

13   Q.  But does that look familiar to you?

14   A.  Yes.

15   Q.  15H, please, and if we could go down to number 14.

16            If you could read that line out loud.

17   A.  "The higher rank are OG Pistols, OYG Doe Boy, YG Rellz,

18   Nightmare, Big Ev and Denaro.

19   Q.  And was that your understanding of those ranks?

20   A.  Yes.

21   Q.  And you previously identified Nightmare as who?

22   A.  Rio.

23   Q.  Is that the person you identified before in the court?

24   A.  Correct.

25   Q.  And we indicated was Ramaiah Jefferson, for the record.

Case No. 14-CR-20119

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1          If we could see 15I, please.  What are we looking

2    at here?

3    A.  Hunnas' names.

4    Q.  And those are the Hunter names, you said?

5    A.  Yes.

6    Q.  And do you recognize some of the names, looking down the

7    list, as members?

8    A.  Yes.

9    Q.  And, in fact, your name is on there, as well, correct?

10   A.  Correct.

11   Q.  What are some of the other names that are familiar to you

12   as members?

13   A.  Glock, Clout, B-Red, 4-5, One Time, Sniper, Dice.

14   Q.  Did there come a time when the ATF asked you to record

15   some telephone conversations?

16   A.  Correct.

17   Q.  Are you familiar with somebody named Bullet?

18   A.  Yes.

19   Q.  Do you know his given name or real name?

20   A.  No.

21   Q.  Was Bullet a Bounty Hunter Blood?

22   A.  Yes.

23   Q.  How did you know Bullet or what did you know Bullet's rank

24   in the Bounty Hunter Bloods to be?

25   A.  A soldier.

Case No. 14-CR-20119

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1   Q.  He was a soldier?  And what kind of thing would he do, if

2   you know?

3   A.  Tag, fight, shoot up some stuff, things like that.

4   Q.  Did there come a time where you had a conversation with

5   him regarding some violence he intended to commit?

6   A.  Yes.

7   Q.  What was the topic of that conversation?

8   A.  Guns, killing somebody.

9   Q.  Killing somebody?

10  A.  Yes.

11  Q.  When you had that conversation with him, what did you do?

12  A.  I told Donovan.

13  Q.  And what did Donovan do?

14  A.  That, I don't know.

15  Q.  He what?

16  A.  That, I don't know.

17  Q.  Did you meet with Donovan?

18  A.  Yes.

19  Q.  And did he give you something?

20  A.  A cell phone.

21  Q.  And was it a cell phone that had a recording device in it?

22  A.  Yes.

23  Q.  So after you received that, did you call Bullet to try to

24  get some more information about that?

25  A.  Yes.

Case No. 14-CR-20119

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1   Q.  And was that conversation recorded?

2   A.  Yes.

3           **MS. BROWN:**  If we could play Government's Exhibit

4   21, please.

5           (Government's Exhibit 21, audiotape, was played.)

6   **BY MS. BROWN:**

7   Q.  Okay.  Early on in the car, there's something about

8   somebody getting their shit blew off.  What does that mean?

9   A.  Head, head shot.

10  Q.  Head shot?

11  A.  Yes.

12  Q.  And how did you know about this?

13  A.  You talking about in the car?

14  Q.  No, the questions that you're asking him about it, about

15  something happening on Joy Road and Vaughn.

16  A.  Oh, prior to that, we talked, and then that's --

17  Q.  You and Bullet?

18  A.  Me and Bullet, correct.  And then I told Donovan.

19  Q.  So you were trying to get a recording of who it was that

20  was the victim?

21  A.  Correct.

22  Q.  There is some mention, Bullet talks about a flue flag,

23  what's a flue flag?

24  A.  That's a blue flag.

25  Q.  Is there a reason that you don't call it blue, or they

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1    didn't call it blue?

2    A.  Yes.

3    Q.  Why?

4    A.  Because it's a Cripp flag.

5    Q.  So what was your understanding of, between the

6    conversation you had had with Bullet before and this phone

7    conversation, who had done the shooting of this person with

8    the flue flag or the blue flag around their mouth?

9    A.  Him.

10   Q.  Him being?

11   A.  Bullet.

12   Q.  Later in the conversation, you're talking about $2 on

13   number four.  Do you know what you were doing at that point?

14   A.  I was filling up the lawn mower.

15   Q.  Lawn mower?

16   A.  Correct.

17   Q.  With gas?

18   A.  Yes.

19   Q.  So that didn't have anything to do with what you were

20   talking to Bullet about, right?

21   A.  No.

22   Q.  But after that, you mentioned, I think you said you were

23   going to straight up have a chopper, right?  And that's

24   what -- chopper is a --

25   A.  AK.

Case No. 14-CR-20119

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1   Q.  And what were you trying to confirm there?

2   A.  I was just getting the guns that was listed so Donovan and

3   them knew.

4   Q.  Had Bullet mentioned to you before, wanting you to get, or

5   wanting to get a chopper?

6   A.  Correct.

7   Q.  For what purpose?

8   A.  To kill.

9   Q.  To kill someone?

10  A.  Yes.

11  Q.  And then you mentioned something called a Tray 8.  What's

12  a Tray 8?

13  A.  That's a .38.

14  Q.  Is that a handgun?

15  A.  Correct.

16  Q.  Do you know where he was supposed to get that Tray 8 or

17  that chopper from?

18  A.  Not that I know of.

19

20  Q.  At the end of the call, you said something about you asked

21  him to give you about four hours.  Why is that?

22  A.  That way, I can tell Donovan to see if he wanted me to

23  stall 'em or spin 'em.

24  Q.  Or what?

25  A.  Or spin 'em.

Case No. 14-CR-20119

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1  Q.  What do you mean by spin 'em?  What do you mean by that?

2  A.  Come up with a excuse.

3  Q.  All right.  So two days later, then, August 27, 2008, do

4  you have another conversation with Bullet?

5  A.  Yes.

6  Q.  And is this one recorded, as well?

7  A.  Yes.

8  Q.  With what?

9  A.  The same phone.

10  Q.  And did you speak with Bullet in between?

11  A.  That, I can't recall.

12  Q.  Do you remember what happened in between the time of the

13  first phone call with Bullet, where you talk about getting the

14  guns to kill somebody, and this second phone call?

15  A.  I can't recall.

16          **THE COURT:**  Could we have the dates of the two

17  phone calls again?

18          **MS. BROWN:**  So the first call, referencing

19  Government's Exhibit 21, was August 25, 2008, and this next

20  call, referencing Government's 22, is August 27, 2008.

21          **THE COURT:**  Thank you.

22  **BY MS. BROWN:**

23  Q.  And this phone call conversation was recorded, correct?

24  A.  Correct.

25

Case No. 14-CR-20119

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1        **MS. BROWN:**  If we could play Government's 22,

2    please.

3            (Government's Exhibit 22, audiotape, was played.)

4    **BY MS. BROWN:**

5    Q.  Now, what are you guys talking about on this, generally

6    speaking, in this conversation?

7    A.  Shooting up they house.

8    Q.  Is this the same shooting that you were talking about two

9    days before, or a different one?

10   A.  I can't recall.

11   Q.  Is it fair to say you talked about a number of shootings

12   with Bounty Hunter members?

13   A.  Yes.

14   Q.  Now, you mentioned Bullet, or as his initials are on the

15   transcription, AG mentions going to pick up a chopper from

16   BH's house.  Do you know who that was?

17   A.  No.

18   Q.  Do you know if that person was a Bounty Hunter member?

19   A.  I don't recall.

20   Q.  And later, AG gives you the reason why.  Do you remember

21   what that was?

22   A.  Yes.

23   Q.  What was that reason?

24   A.  Somebody snitched on him.

25   Q.  Do you know the circumstance of that?

                    Case No. 14-CR-20119

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1   A.  No.

2   Q.  What is your understanding of the word snitch?

3   A.  Telling.

4   Q.  And what was your understanding from the call that Bullet

5   was going to do as a result of somebody snitching on him?

6   A.  Kill 'em.

7   Q.  Is that what he means when he says he's going to chop it

8   up?

9   A.  Yeah.

10  Q.  In October of 2008 -- well, let me back up.  Do you ever

11  go with him to do this?

12  A.  No.

13  Q.  What happens instead?

14  A.  That, I don't know.  I just know that Donovan and Joe

15  stopped it.

16  Q.  Somehow they stopped it?

17  A.  Yes.

18  Q.  So as far as you know, this shooting never happened,

19  correct?

20  A.  Correct.

21  Q.  In October of 2008, did you have more conversations with

22  Bullet?

23  A.  Yes.

24  Q.  And were those recorded using that same phone?

25  A.  Yes.

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1   Q.  If we could listen to Government's Exhibit 23A, please.

2              (Government's Exhibit 23A, audiotape, was

3              played.)

4   **BY MS. BROWN:**

5   Q.  So the beginning and the end of that call you say

6   something called "Suwoop."  What's Suwoop?

7   A.  It's like saying hi.

8   Q.  Does that have a special meaning within the Bounty Hunter

9   Bloods?

10  A.  Yeah.

11  Q.  What is it?

12  A.  It's like a greeting.

13  Q.  And is it used beyond just on the telephone or when you

14  see somebody on the street?

15  A.  Yep.

16  Q.  How else is it used?

17  A.  We tag with it.

18  Q.  Anything else?

19  A.  That I can recall, no.

20  Q.  I'm going to walk through some of this recording.  AG, or

21  Bullet, says something about getting -- is it like Doogie on

22  some Foe Life ends?  What is that?

23  A.  Getting low on 'em.

24  Q.  Getting low on them?

25  A.  Yes.

Case No. 14-CR-20119

Antwuan Council - Direct Examination
Wednesday, July 29, 2015

1   Q.  What does that mean?

2   A.  Getting down on them.

3   Q.  And what does it mean to get down on somebody?

4   A.  Shot at 'em.

5   Q.  Okay.  To shoot at them?

6   A.  Yes.

7   Q.  And was it your understanding that this is something that

8   already happened?

9   A.  As of then, yes.

10  Q.  And he references it happening at Ford.  What is he

11  talking about?

12  A.  Henry Ford High School.

13  Q.  If you know, had something happened at Henry Ford High

14  School that involved the Bounty Hunter Bloods?

15  A.  Did I know, like --

16  Q.  Was there a shooting there?

17  A.  Yes.

18  Q.  And did you know about that shooting when you were talking

19  to Bullet?

20  A.  Yes.

21  Q.  So when Bullet is discussing this about -- with you, he

22  says something about, "They said 'F y'all.  BHB ends.'"

23  What's he talking about there?

24  A.  Foe Life was saying F, F BHB.

25  Q.  And if you know, was this fight at Henry Ford, was that

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1    with Foe Life?  Was that against Foe Life?

2    A.  Yes.

3    Q.  There's some reference to MOB.  Where does that fit in?

4    A.  That's a different group.

5    Q.  And were they, if you know, were they also involved in

6    this fight or shooting at Henry Ford High?

7    A.  That, I don't know.

8    Q.  You said, at one point, "You know I'm trying to put in

9    some work."  What did you mean by that?

10   A.  Like tag, fight, things like that.

11   Q.  And I know at the time you were working with the ATF, but

12   what did your understanding, what would work have accomplished

13   for you, putting in work as a member of the Bounty Hunter

14   Bloods?

15   A.  If we put in work, try to get a gun with us so I can let

16   them know, which is Donovan and Joe, so they can get the gun

17   off the street.

18   Q.  When you put in work as it's known within the gang, what

19   happens?  Are you rewarded?

20   A.  By who?

21   Q.  By a member.  Like if you put in work --

22   A.  Oh.

23   Q.  -- what happens as it relates to your membership?

24   A.  You move up in rank.

25   Q.  And would doing a shooting qualify as putting in work?

Case No. 14-CR-20119

Antwuan Council - Direct Examination
Wednesday, July 29, 2015

1    A.  Correct.

2    Q.  So is that what you were talking about with Bullet?

3    A.  Yes.

4    Q.  So when he says, "I was going to just go ahead and put in

5    the work by myself," what did he mean?  What did you

6    understand him to mean?

7    A.  Solo, by hisself.  He wasn't gonna take nobody with him.

8    Q.  You asked him later if he was going to the meeting

9    tomorrow.  Do you recall that?

10   A.  Yes.

11   Q.  What were you talking about?

12   A.  A meeting where we all meet up and talk.

13   Q.  Like the meeting we saw in the audio visual?

14   A.  Correct.

15   Q.  Was there another phone call that you had recorded between

16   yourself and Bullet, as well?

17   A.  Yes.

18        **MS. BROWN:**  If we could listen to 23B, please.

19        (Government's Exhibit 23B, audiotape, was

20        played.)

21        **MS. BROWN:**  For the record, that call was October

22   16 of 2008.

23   **BY MS. BROWN:**

24   Q.  In the beginning of that call, you say, "This shit hot."

25   What do you mean by that?

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1    A.   It's on the news and everything.

2    Q.   And when you say "this," what are you talking about "this"

3    is?

4    A.   The shooting.

5    Q.   Is this the same shooting, the Henry Ford shooting, or a

6    different one?

7    A.   Correct.

8    Q.   Same one?

9    A.   Same one.

10   Q.   In the conversation, you say something, you ask if you

11   want him to -- if he wants to grab the burner or take you to

12   hide and stash it.  What did you mean when you said that?

13   A.   That I -- did he want me to pick it up and take it and

14   hide it.

15   Q.   And he says to you that the burner was already put up.

16   What did you understand him to mean by that?

17   A.   He had hid it already.

18   Q.   At some point, we hear a female in the background say

19   something like, "Don't try to get smart and then think

20   somebody on the phone listening."  Do you recognize that

21   voice?

22   A.   That's my mother.

23   Q.   Was she talking to you?

24   A.   I can't recall.

25   Q.   During this time, did she know you were working and

87

Antwuan Council - Direct Examination
Wednesday, July 29, 2015

1    recording phone calls?

2    A.  No.

3    Q.  So you had to hide that from her?

4    A.  Yes.

5    Q.  And you were living at home?

6    A.  Yes.

7    Q.  Later on, you say, "We gonna do what we gonna do tomorrow,

8    you gonna choose that same one?"  And Bullet says, "I'm gonna

9    use another gun."

10            What are you guys talking about there?

11   A.  Was he going to use the same gun he used in the shooting.

12   Q.  And he says he's going to use a different one?

13   A.  Correct.

14   Q.  What happens after that conversation?  Do you see Bullet

15   later?

16   A.  That, I don't recall.

17           **MS. BROWN:**  If we could listen to 23C, indicating

18   for the record the call on October 17, 2008.

19           (Government's Exhibit 23C, audiotape, was

20           played.)

21   **BY MS. BROWN:**

22   Q.  Early on in that call when you call him and you say you're

23   watching the news and they got three shooters, what are you

24   talking about there?

25   A.  The shooting that happened.

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1  Q.  At?

2  A.  Henry Ford High School.

3  Q.  And then later on, he asked you about the chopper and

4  where it is.  What is he talking about there?

5  A.  He was talking about how many guns they had found, and he

6  put up the chopper.

7  Q.  How many guns who had found?

8  A.  The cops.

9  Q.  Was it common or uncommon in the BHB to store multiple

10  guns together?

11  A.  Common.

12  Q.  And would they be stored at Bounty Hunter members' homes?

13  A.  Most of the times.

14  Q.  Were guns shared?

15  A.  Yes.

16  Q.  How were they shared?

17  A.  Throughout the group.

18  Q.  Throughout the group?

19  A.  Yes.

20  Q.  So if you needed a gun, what would you do?

21  A.  I would call.

22  Q.  You would call who, a member?

23  A.  Yes.

24  Q.  There's some mention about Jay Nutty and Papa Smurf being

25  with -- Bullet mentions them being with him.  Did you know who

Case No. 14-CR-20119

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1  they were?

2  A.  No.

3  Q.  And you said later that, when you asked about Papa Smurf,

4  that, "He's the new Hunter and he got down like that."  What

5  does that mean?

6  A.  He got down a month ago.

7  Q.  Does that mean he got Blood-in?

8  A.  Yes, Blood-in.

9  Q.  You said something, "He's been the head soldier over there

10 in the hood, over by Clout's house."  What does that mean?

11 A.  He over the soldiers.

12 Q.  The head soldier?

13 A.  Yeah.

14 Q.  So that refers to his rank?

15 A.  Yes.

16 Q.  Who's Clout?

17 A.  It's another Hunter.

18 Q.  Later, a couple minutes, a couple seconds later, Bullet

19 says, "Problem made that N a head soldier and shit."  What's

20 he talking about with that?

21 A.  Somebody made him the head soldier.

22 Q.  Do you know Problem?

23 A.  No.

24 Q.  Do you know what rank he was then?

25 A.  No.

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1    Q.  In order to make somebody a head soldier, do you have to

2    be higher in rank in the Bounty Hunter Bloods?

3    A.  Correct.

4    Q.  Is that how rank is given out, by higher members?

5    A.  Yes.

6    Q.  There's some mention later on about Bullet talking to

7    ASAP.  Is that the same ASAP that you were in the car with

8    when the police pulled you over?

9    A.  Yes.

10   Q.  He says something about smashing people back to back.

11   What does that mean?

12   A.  Fighting.

13   Q.  And he also says, "I'm gonna get me a lick."  What does

14   that mean?

15   A.  Rob.

16   Q.  Later on, he's talking about the MOB's and they're running

17   your hood 24/7.  What is the significance of that?

18   A.  Meaning that they running it, meaning that they

19   overpowering us, things like that.

20   Q.  Early on in your testimony yesterday, you talked about

21   territory?

22   A.  Correct.

23   Q.  And remind us again, what's the significance of territory

24   within a gang?

25   A.  The area you run.

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1  Q.  And so what is he talking about there with respect to

2  territory, then, and MOBs?

3  A.  That MOBs saying that that's theirs, they territory.

4  Q.  So they're trying to claim your territory, then?

5  A.  Yes.

6  Q.  Did there come a point in time in November of 2008 where

7  you had occasion to witness a gang fight while you were

8  operating with the ATF, between the Bounty Hunter Bloods and

9  another gang?

10  A.  Yes.

11  Q.  At a school?

12  A.  Yes.

13  Q.  Do you remember who the other gang was?

14  A.  Brightmoor Cripps.

15  Q.  And where did that fight happen?

16  A.  MTA.

17  Q.  Do you know what MTA stands for?

18  A.  No.

19  Q.  But it's a high school?

20  A.  Yes.

21  Q.  Where is it located?

22  A.  On Telegraph and Plymouth.

23  Q.  Do you know what city that is?

24  A.  Redford.

25  Q.  What led up to that fight?

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1    A.  Something with another Hunter.

2    Q.  Between another Hunter and the Brightmoor gang?

3    A.  Yes.

4    Q.  And so because of that, how was it communicated there

5    would be a fight?  How did that get organized?

6    A.  They -- Ant called me.

7    Q.  Someone named Ant called you?

8    A.  Yes.

9    Q.  Do you know that person's real name?

10   A.  No.

11   Q.  Was he a BHB?

12   A.  Yes, YG.

13   Q.  He was a YG in the Bounty Hunters?

14   A.  Yes.

15   Q.  Without telling us what he says, he calls you and says

16   what?

17   A.  Come over, we about to have a meeting, we had a meeting

18   and, like, we about to go to the school.

19   Q.  So did he mean immediately, then?

20   A.  Yes.

21   Q.  So where do you go?

22   A.  I went to Dale Street to meet up with them, and then we

23   left Dale Street and went to the school.

24   Q.  Did you know what the meeting was going to be about when

25   you got there, or did you find out when you got there?

Case No. 14-CR-20119

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1    A.  I found out when I got there.

2    Q.  So you didn't have a recording device with you then,

3    correct?

4    A.  Correct.

5    Q.  Is that why, because you didn't know what it was about?

6    A.  Correct.

7    Q.  When you get to the meeting on Dale Street, is it a house,

8    or something else?

9    A.  It's a house.

10   Q.  Does somebody live at the house?

11   A.  Yes.

12   Q.  Who?

13   A.  That, I don't know.

14   Q.  Who was at that house for the meeting?

15   A.  It was a lot of people.

16   Q.  Do you remember some of them?

17   A.  G-Red, Ant, they're the main ones that I can remember.

18   Q.  More than three people?

19   A.  Yes.

20   Q.  More than four people?

21   A.  Yes.

22   Q.  Five?

23   A.  Yes.

24   Q.  Seven?

25   A.  That, I can't recall.

Case No. 14-CR-20119

Antwuan Council - Direct Examination
Wednesday, July 29, 2015

1    Q.  Okay.  So somewhere between five and seven people,

2    correct?

3    A.  Correct.

4    Q.  How long does the meeting take place?

5    A.  That, I don't recall neither.

6    Q.  And what's discussed at the meeting?

7    A.  About what happened and what's about to happen.

8    Q.  And what did you understand had happened?

9    A.  That, I don't recall.  I just know that something happened

10   with a Hunter.

11   Q.  And a rival gang?

12   A.  Yes.

13   Q.  That was the Brightmoors?

14   A.  Yes.

15   Q.  So after that meeting, what do you do?

16   A.  We get in the cars, go up there to fight.

17   Q.  And do you remember, was school in session or were you,

18   what was the timing in terms of school?

19   A.  School was still in, in session.

20   Q.  So when you drive up there, what do you do?

21   A.  We met outside and fought.

22   Q.  Outside of what?

23   A.  The school.

24   Q.  And what do you do when you get there?

25   A.  We start fighting.

Case No. 14-CR-20119

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1   Q.  So do you wait?  I mean, are the other gang members of the

2   rival --

3   A.  Other gang was there, too.

4   Q.  They were there?

5   A.  Yes.

6   Q.  Did they know you were coming to fight them?

7   A.  Apparently, yes.

8   Q.  So when you get there, how many of the other gang, of the

9   Brightmoor gang members are there?

10  A.  It was a nice number of them, too.

11  Q.  It was a nice number?

12  A.  Yes.

13  Q.  About the same as you, or more, or less?

14  A.  More.

15  Q.  So what happens?

16  A.  We start fighting.

17  Q.  And did you participate, as well?

18  A.  Yes.

19  Q.  And how long does the fight last?

20  A.  That, I don't know.

21  Q.  Is it only physical, or are there weapons involved?

22  A.  Just physical.

23  Q.  How do you know when it's over then?

24  A.  Everybody run.

25  Q.  Everybody runs?

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1   A.  Yes.

2   Q.  Did somebody come to break up the fight?

3   A.  Yeah.

4   Q.  Is that how it ended?

5   A.  Yeah, Redford cops came.

6   Q.  So when Redford cops come, what do you do to get out of

7   there?

8   A.  We ran, ran back to the cars.

9   Q.  And then where do you go?

10  A.  Back to Dale Street.

11  Q.  The same place you originally met?

12  A.  Yep.

13  Q.  Does everybody participate in that fight?

14  A.  Yes.

15  Q.  Did anybody decide they didn't want to?

16  A.  No.

17  Q.  Do you know someone named K-Ron?

18  A.  Yes.

19  Q.  Was K-Ron there at that fight that day?

20  A.  He was supposed to be there.

21  Q.  How do you know he was supposed to be there?

22  A.  'Cause he got violated like a day, like a day or two

23  later.

24  Q.  So how did you find out that K-Ron was supposed to be

25  there?

Case No. 14-CR-20119

Antwuan Council - Direct Examination
Wednesday, July 29, 2015

 1  A.  From, from Ant.

 2  Q.  So Ant told you that K-Ron was supposed to participate in

 3  the fight?

 4  A.  Yes.

 5  Q.  But K-Ron wasn't there when you were fighting?

 6  A.  No.

 7  Q.  So Ant tells you this afterward?

 8  A.  Yes.

 9  Q.  Does he tell you what's going to happen, then, to K-Ron

10  because he didn't participate in the fight?

11  A.  He gonna violate him.

12  Q.  He'll get violated?

13  A.  Yeah.

14  Q.  So you said a day later this happens?

15  A.  Like day or two later, correct.

16  Q.  And where does it happen?

17  A.  Somewhere off Schoolcraft.

18  Q.  I'm sorry?

19  A.  Somewhere off Schoolcraft.

20  Q.  Was it in a house or somewhere else?

21  A.  It was at a house, but in the backyard.

22  Q.  The backyard of a house?

23  A.  Yes.

24  Q.  And how did they get K-Ron there?  Did they tell him he

25  was going to be violated?

Case No. 14-CR-20119

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1    A.   Yes.

2    Q.   And are you there?

3    A.   Yes.

4    Q.   Do you remember, was this daytime?

5    A.   Yes.

6    Q.   Who else is there?

7    A.   B-Red, Ant, G-Red, that I can remember.

8    Q.   You said that Ant -- was it Ant who decided that K-Ron

9    would be violated?

10   A.   Yes.

11   Q.   And was he a higher rank than K-Ron?

12   A.   Yes.

13   Q.   Was that common or uncommon for a higher rank to decide

14   who would be violated?

15   A.   Common.

16   Q.   Was this a common type of violation for not participating

17   in a fight on behalf of the Bounty Hunters?

18   A.   Yes.

19   Q.   So what happens when K-Ron arrives?

20   A.   Ant told him that he was about to be violated.

21   Q.   And how does he respond?

22   A.   "Okay."

23   Q.   And what happens?

24   A.   He fought each person for 60 seconds.

25   Q.   So each Bounty Hunter had to fight him, fight K-Ron?

Antwuan Council - Direct Examination
Wednesday, July 29, 2015

1    A.  Yeah, for 60 seconds.

2    Q.  Did he have to hold anything, or anything like that?

3    A.  That, I don't recall.

4    Q.  So did you participate in that, as well?

5    A.  Yes.

6    Q.  And was that recorded?

7    A.  That, I don't know.

8    Q.  When the fighting was over, what happened?

9    A.  I went home, I think.

10   Q.  You went home?

11   A.  Yes.

12   Q.  Was K-Ron still a member at the end of that violation?

13   A.  Yes.

14   Q.  What was his physical state when that was done?

15   A.  He was walkable.

16   Q.  He was walkable?

17   A.  Yeah.

18   Q.  Pretty bad shape?

19   A.  Not that I can -- he had a few bumps and, you know, busted

20   lip and everything.

21   Q.  Nothing unusual for a violation, then?

22   A.  Yes.

23   Q.  You indicated that one of the things that Bounty Hunter

24   members would do would be to sell drugs, correct?

25   A.  Correct.

Case No. 14-CR-20119

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1    Q.  And at some point, did you become acquainted with the

2    person you've identified in court as Rio or Nightmare?

3    A.  Correct.

4    Q.  Did you understand him to be somebody that sells drugs?

5         **MR. GUREWITZ:**  Objection, Your Honor, there's no

6    foundation.

7         **THE COURT:**  Sustained.

8    **BY MS. BROWN:**

9    Q.  What was Rio's or Nightmare's role in the gang?  Not his

10   rank, necessarily, but what did he do?  What was his --

11        **MR. GUREWITZ:**  There's no foundation for that

12   either, Your Honor.

13        **THE COURT:**  Sustained.

14   **BY MS. BROWN:**

15   Q.  Did you spend a lot of time with Rio at a certain point?

16   A.  No.

17   Q.  At some point, were you given a cell phone to make

18   recordings involving Rio or Nightmare?

19   A.  Correct.

20   Q.  And what were those phone calls to concern?

21   A.  To get -- to buy some weed.

22   Q.  And how did you know to call Rio to buy weed from him?

23   A.  Because I heard from the Seven Mile Hunters that he had

24   access to it.

25   Q.  So when you learned that, did you place some phone calls

Case No. 14-CR-20119

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1    to Jefferson --

2    A.  Yes.

3    Q.  -- or Rio?

4           If we could -- and were those recorded?

5    A.  Correct.

6           **MS. BROWN:**  If we could play 26A, please.

7           (Government's Exhibit 26A, audiotape, was

8           played.).

9    **BY MS. BROWN:**

10   Q.  Who were you talking to there?

11   A.  Rio.

12   Q.  So RJ on the transcription is when Rio is talking,

13   correct?

14   A.  Correct.

15   Q.  Is that the first time you'd ever spoken to Rio?

16   A.  No.

17   Q.  So you'd known him before that, then, correct?

18   A.  Yes.

19          **MS. BROWN:**  Indicating for the record this phone

20   call is December 4th, 2008.

21   **BY MS. BROWN:**

22   Q.  There's some mention of a bow.  I believe you told us

23   before, but can you remind us what a bow is?

24   A.  It's a pound.

25   Q.  A pound of what?

Case No. 14-CR-20119

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1   A.  Weed.

2   Q.  And he responds something about, "Are you looking for a

3   half, quarter?"  What was he talking about, that you

4   understand to be talking about?

5   A.  The amount.

6   Q.  Amount of what?

7   A.  Weed.

8   Q.  So you were looking to get marijuana from him to do what,

9   or at least what were you explaining to him that you wanted to

10  do with it?

11  A.  Sell it.

12  Q.  And within the Bounty Hunters, what was one of the reasons

13  that people would sell weed?

14  A.  To buy guns.

15  Q.  Did that money also sometimes go back to the pot?

16  A.  Yes.

17          **MS. BROWN:**  If we could play 26B, please, December

18  4th, 2008.

19          (Government's Exhibit 26B, audiotape, was

20          played.)

21          **MR. AMBERG:**  Before we start, I'm a little confused

22  Your Honor.  I don't mean to object, but on our thing, there's

23  different numbers than what you're saying.  Want to make sure

24  we're on the same page.

25          **MS. BROWN:**  Sure.  The exhibit number that I am

Case No. 14-CR-20119

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1   referencing is the exhibit number that it was admitted into

2   evidence with.  The exhibit on the screen is the ATF number,

3   meaning the exhibit number placed on the item when it was

4   placed on evidence in a secure vault through ATF.

5             **MR. AMBERG:**  Okay.

6             **THE COURT:**  And the trial exhibit number is 26B.

7             **MS. BROWN:**  Correct.  The numbers I'm referencing

8   are only trial exhibit numbers.

9             **THE COURT:**  All right.

10            **MS. BROWN:**  So 26B, please.

11  **BY MS. BROWN:**

12  Q.  Did this phone call take place the same day, then?  Is

13  this phone call following up on the phone call we just heard?

14  A.  Correct.

15  Q.  And when you say -- when he says he's going to get them

16  for a stack flat, what did you understand him to mean?

17  A.  A thousand dollars.

18  Q.  A thousand dollars?

19  A.  Yep.

20  Q.  So was it your understanding that you would pay a thousand

21  dollars for what?

22  A.  A bow, a pound of weed.

23  Q.  Did you ever obtain that marijuana, then?

24  A.  Not that I recall.

25  Q.  Did you have another conversation with Ramaiah Jefferson

Case No. 14-CR-20119

Antwuan Council - Direct Examination
Wednesday, July 29, 2015

1   or Rio/Nightmare?

2   A.  Yes.

3            **MS. BROWN:**  If we could listen to 25A, please.

4            (Government's Exhibit 25A, audiotape, was

5            played.)

6   **BY MS. BROWN:**

7   Q.  At the beginning of this call, the other party on the

8   call, again, is Rio?

9   A.  Yes.

10  Q.  And you're asking him if he knows somebody whose got a

11  two-ly?

12  A.  Yes.

13  Q.  What's a two-ly?

14  A.  That's a gun.

15  Q.  He responds something like .32.  What's a .32?

16  A.  It's a handgun.

17  Q.  Does that refer to the caliber of the handgun?

18  A.  Yes.

19  Q.  And then he says later, he got a .22 rifle.  What's a .22

20  rifle?

21  A.  It's another gun.

22  Q.  What was your understanding of that phone call then?  What

23  was the purpose?  What did you want from him?

24  A.  To buy a gun.

25  Q.  Was that a common occurrence within the Bounty Hunter

Case No. 14-CR-20119

Antwuan Council - Direct Examination
Wednesday, July 29, 2015

1    Bloods?

2    A.  Yes.

3              **MS. BROWN:**  If we could hear 25B, please.

4    Indicating for the record this is the same exhibit, same

5    conversation, a separate clip.

6              **THE COURT:**  Date on that, please?

7              **MS. BROWN:**  December 5th of 2008.

8              (Government's Exhibit 25B, audiotape, was

9              played.)

10   **BY MS. BROWN:**

11   Q.  At the beginning of this conversation, you're talking to

12   Rio about smashing Dale or smash Dale.  What does that mean?

13   Or he's talking about that, actually.

14   A.  That I don't, I don't recall.

15   Q.  Do you know what Dale is?

16   A.  It's a street.

17   Q.  He goes on to say that, "They moved on my block, they

18   moved on Grandville."  What's that conversation about?

19   A.  Some people moved on his street.

20   Q.  And is that a reference to some territory for the Bounty

21   Hunter Bloods?

22   A.  Yes.

23   Q.  And so what was he -- what did you understand him to mean

24   about, talking about there being a problem and knocking teeth

25   out?

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1          **MR. GUREWITZ:**  Objection, Your Honor, there's no

2    basis so far that he's –– he said he didn't know in the prior

3    answer about this.  There's no basis to how he knows the

4    answer to this question.

5          **MS. BROWN:**  If I may, I'm asking for his

6    interpretation of what he understood Ramaiah Jefferson to mean

7    in this call.

8          **THE COURT:**  But he already said that he didn't know

9    what the reference to smashing Dale was about.

10          **MS. BROWN:**  Okay.  I'll move on to a different area

11    then.

12          **THE COURT:**  Please.

13    **BY MS. BROWN:**

14    Q.  What does he mean when he's talking about people moving on

15    Grandville?

16    A.  Some people moving there, living there now.

17    Q.  Living there?

18    A.  Yeah.

19    Q.  And what was your understanding about why he was concerned

20    about that?

21          **MR. GUREWITZ:**  If he knows, Your Honor.  He hasn't

22    said that he can recall presently what it's about.

23          **THE COURT:**  If you know.  You can't speculate,

24    can't guess.  If you know, what was he complaining about?

25          **THE WITNESS:**  All right.

Case No. 14-CR-20119

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1    **THE COURT:**  Do you know?

2    **THE WITNESS:**  No.

3    **BY MS. BROWN:**

4    Q.  Later on, you ask him about hearing about you guys and the

5    Brightmoor N's.  What are you talking about there?

6    A.  The fight we had at the school, MTA.

7    Q.  And was it your understanding from the phone call that he

8    knew what you were talking about?

9    A.  Yes.

10   Q.  Even though he hadn't been there.

11   A.  Correct.

12   Q.  At some point, he asks you if you're out here hustling and

13   working.  What do you understand him to mean by that?

14   A.  Selling weed and working.

15   Q.  He was a higher rank than you, correct?

16   A.  Correct.

17   Q.  As a higher rank, was that part of his responsibility, to

18   make sure you were out working and making money?

19   A.  Yes.

20   Q.  Why?

21   A.  Pot money.

22   Q.  At some point, he's talking about his phone and he talks

23   about people being out of state.  Did you understand what he

24   was talking about there?

25   A.  Yes.

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1    Q.  What does that mean?

2    A.  Out-of-state people calling him.

3    Q.  Part of the Bounty Hunters?

4    A.  Yes.

5         **MR. GUREWITZ:**  Objection, Your Honor, that's

6    speculation.  There's no basis in his answer so far to give an

7    opinion.

8         **THE COURT:**  Well, he's not shy about saying when he

9    doesn't know; he says I don't know or I don't recall.  If he

10   answers that he knows, then -- you understand, Mr. Council,

11   you can only testify from your own personal knowledge.

12        **THE WITNESS:**  Okay.

13        **THE COURT:**  Okay.

14   **BY MS. BROWN:**

15   Q.  You, yourself, had traveled out of state at this point

16   to -- with the Bounty Hunters, correct?

17   A.  Correct.

18   Q.  And were there other Bounty Hunters in other states, if

19   you know?

20   A.  Yes.

21   Q.  And so what did you understand this reference by Ramaiah

22   Jefferson or Rio to out-of-state members to be?

23   A.  Out-of-state members in different part of the lines

24   calling.

25   Q.  In the Bounty Hunters?

Case No. 14-CR-20119

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1    A.   Correct.

2    Q.   And they were calling Rio?

3    A.   Correct.

4         **MS. BROWN:**  If we could hear 25C, please.

5         **MR. GUREWITZ:**  Excuse me, before we start this, may

6    I just confer with Ms. Brown for a moment?

7         **THE COURT:**  Yes.

8         (Discussion held off the record.)

9         **MS. BROWN:**  Before you play that --

10        (Brief pause.)

11        **MR. GUREWITZ:**  I'm sorry, Your Honor, the copy of

12   the transcript I have doesn't have these divisions.

13        **THE COURT:**  Okay.

14        **MS. BROWN:**  If we could hear 25C please.

15        (Government's Exhibit 25C, audiotape, was

16        played.)

17        **MS. BROWN:**  Can we stop?  If you could just pause

18   it.

19        (Brief pause.)

20   **BY MS. BROWN:**

21   Q.   At some point in February of 2009, did you go to a house

22   on Stahelin in northwest Detroit?

23   A.   Yes, I did.

24   Q.   Was that the same house or a different house that the

25   Blood-in that we saw on the video was?

Case No. 14-CR-20119

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

 1   A.  Correct.

 2   Q.  It's the same one?

 3   A.  Yes.

 4   Q.  The one with the writing on the wall, correct?

 5   A.  Yes.

 6   Q.  Who directed you to go to that house?

 7   A.  I was just stopping by.

 8   Q.  Why were you stopping by?

 9   A.  It's usual.

10   Q.  It's what?

11   A.  It's usual.

12   Q.  It's usual?

13   A.  Yes.

14   Q.  Is that a hangout?

15   A.  Yes.

16   Q.  Is that an occupied house, or unoccupied house?

17   A.  A vacant house.

18   Q.  Do you remember about what time of day this was?

19   A.  It was light out.

20   Q.  And when you got there, who was present?

21   A.  Killer J and Glock.

22   Q.  Did you know them by their real names?

23   A.  I knew Glock name.

24   Q.  That's David Gay that you've referred to before?

25   A.  Correct.

Case No. 14-CR-20119

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1   Q.  And did you have a conversation with them when you got

2   there?

3   A.  Yes.

4   Q.  And what did you guys discuss?

5   A.  That they was gonna rob somebody.

6   Q.  Who told you they were going to rob somebody?

7   A.  Killer J.

8   Q.  And did you see anything while you were there?

9   A.  Yes.

10  Q.  What did you see?

11  A.  He showed me a .22 rifle.

12  Q.  And where was that rifle in the house?

13  A.  Underneath a blanket next to him.

14          **THE COURT:**  I'm sorry, again?

15          **THE WITNESS:**  Underneath a blanket next to him.

16  **BY MS. BROWN:**

17  Q.  And so what did you respond at that point?

18  A.  That, I don't recall.

19  Q.  Did they say they were going to do anything else to this

20  person?

21          **MR. GUREWITZ:**  Objection, Your Honor.  The question

22  mischaracterizes his prior answer.  He's talking about what

23  Killer J had to say, not Killer J and someone else.

24          **THE COURT:**  Sustained.

25

Case No. 14-CR-20119

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1    **BY MS. BROWN:**

2    Q.  Was there any other conversation about what else was going

3    to happen besides a robbery?

4    A.  Kill 'em.

5    Q.  Kill somebody?

6    A.  Yes.

7    Q.  Did they say who?

8    A.  No.

9              **MR. GUREWITZ:**  I'm sorry?

10             **THE COURT:**  Let's use a specific pronoun if you're

11   speaking about a specific person, please.

12   **BY MS. BROWN:**

13   Q.  Okay.  Did Killer J say who?

14   A.  No.

15   Q.  Did David Gay say who?

16   A.  No.

17   Q.  So what do you do when you get there?

18   A.  We set there and talked, I smoked a Black and Mild.

19   Q.  Is that a type of cigarette?

20   A.  Yes.

21   Q.  And were they smoking anything?

22   A.  Not at that point, no.

23   Q.  So what happens next?

24   A.  Marquise comes over.

25   Q.  And is Marquise somebody you knew?

Case No. 14-CR-20119

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1   A.  Yes.

2   Q.  How did you know Marquise?

3   A.  I grew up with him.

4   Q.  So like how long had you known him?

5   A.  I grew up with him since I was like one, two.

6   Q.  Years of age?

7   A.  Yes.

8   Q.  And when Marquise came over, what did he do, did he have

9   anything with him?

10  A.  They started smoking.

11  Q.  Smoking what?

12  A.  Weed.

13  Q.  Before Marquise came over, did you see anybody do anything

14  like call him or anything like that?  See any phone calls

15  being placed?

16  A.  David was texting him.

17  Q.  David Gay was?

18  A.  Yeah.

19  Q.  And how long after that does Marquise show up?

20  A.  A couple minutes later.

21  Q.  Does anybody else show up during this time?

22  A.  Somebody came to the door.

23  Q.  And did they come in?

24  A.  No, David stopped them from coming in.

25  Q.  So Marquise comes over, and who begins smoking weed?

Case No. 14-CR-20119

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1   A.  David, Killer J and Marquise.

2   Q.  So how long do they stay there smoking weed?

3   A.  We wasn't there that long.

4   Q.  Where are you in the house?

5   A.  In the bedroom to the front of the house.

6   Q.  And what else was in that bedroom?

7   A.  Crates, a blanket, a bench.

8   Q.  What kind of a bench, if you remember?

9   A.  It's like a bench you would sit on.

10  Q.  Did it have anything written on it?

11  A.  That, I don't recall.

12  Q.  So there's four of you in there, then, is that right?

13  A.  Correct.

14  Q.  What are you talking, is everybody talking together, are

15  you talking individually?

16  A.  We're just talking in general.

17  Q.  And then what happens?

18  A.  Marquise get up to leave and shook David hand first, shook

19  Marquise hand, then he shook my hand.

20          **MR. GUREWITZ:**  Excuse me, Your Honor, I can't

21  understand.

22          **THE COURT:**  I can't either.  I'm sorry, you're

23  going to have to slow down and speak as clearly as you can.

24          **THE WITNESS:**  Okay.

25          **THE COURT:**  All right.

Case No. 14-CR-20119

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1   **BY MS. BROWN:**

2   Q.  So you said Marquise got up and shook somebody's hand?

3   A.  He shook David hand first.

4   Q.  And then whose hand did he shake next?

5   A.  Killer J.

6   Q.  And then what happened?

7   A.  Then he shook my hand.

8   Q.  And then what happened?

9   A.  He turned, took one step.  That's when Killer J lifted the

10  .22 rifle and shot him in the back of the head.

11  Q.  Shot Marquise?

12  A.  Yes.

13  Q.  How far away were you from Marquise when that happened?

14  A.  I was like this, Marquise, I was standing right here.

15  Q.  A matter of feet?

16  A.  Yeah.

17  Q.  What was your reaction?

18  A.  I was scared.

19  Q.  Did you know that Marquise was the person that Jayjuan

20  Watts, or that Killer J, had made reference to killing or

21  wanting to kill?

22  A.  No, I did not.

23  Q.  Did Killer J say anything to Marquise before he pulled the

24  gun out to shoot him?

25  A.  He asked him about a ring that his father gave him.

Case No. 14-CR-20119

Antwuan Council - Direct Examination
Wednesday, July 29, 2015

1    Q.  So Marquise was wearing the ring?

2    A.  Yes.

3    Q.  And how long after that does he shoot him?

4    A.  After he said bye to each person.

5    Q.  After Marquise did?

6    A.  Yes.

7    Q.  After he shoots him, you said you were scared, correct?

8    A.  Correct.

9    Q.  What happens next?

10   A.  Killer J set the gun down and then he started going

11   through his pockets.

12   Q.  Through whose pockets?

13   A.  Marquise' pockets.

14   Q.  What happens next?

15   A.  They attempted to try and move the body, but they couldn't

16   move it.

17   Q.  And did they ask you to help them?

18   A.  Yes.

19   Q.  What did you do?

20   A.  I didn't help.

21   Q.  Did not?

22   A.  Did not.

23   Q.  Was there a reason why you didn't?

24   A.  Because I didn't want to touch the body.

25          **MR. GUREWITZ:**  Your Honor, I'm sorry, I didn't

Case No. 14-CR-20119

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1    understand that answer either.

2    **BY MS. BROWN:**

3    Q.  Can you repeat your answer?

4    A.  I didn't want to touch the body.

5    Q.  Why didn't you want to touch the body?

6    A.  Because I knew that I could get charged with murder.

7    Q.  What do you do next?

8    A.  We leave the house and I call Donovan.

9    Q.  Do you leave separately?

10   A.  Yes.

11   Q.  And are you leaving on foot, or are you in a car?

12   A.  I'm in a car.

13   Q.  Was there any house of significance to you, or did you

14   know anything about the house across the street from this

15   home?

16   A.  It was David house.

17   Q.  Did you know or did they tell you where they were going to

18   go when you left?

19   A.  No.

20   Q.  So you left and got in your car and immediately called

21   who?

22   A.  ATF.

23   Q.  And did you tell Donovan?

24   A.  Yes.

25   Q.  Where did you go next?

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1  A.  To pick up my niece from school.

2  Q.  Did you tell Donovan that was what you were going to do?

3  A.  Yes.

4  Q.  Do you receive any other phone calls while you're on your

5  way to pick up your niece from school?

6  A.  Yes.

7  Q.  From whom?

8  A.  Killer J.

9  Q.  From Killer J?

10  A.  Killer J and Dave, yes.

11  Q.  So they both were calling you?

12  A.  No, no, no, they was together.

13  Q.  But they were calling you?

14  A.  Yes.

15  Q.  What was reason they were calling you?  What did they tell

16  you?

17  A.  Wanted me to --

18         **MR. GUREWITZ:**  Objection, Your Honor, who was

19  talking?  Is this a cell phone conversation?

20         **THE COURT:**  I think he identified Killer J as the

21  caller.

22  **BY MS. BROWN:**

23  Q.  Who was speaking to you on the phone?

24  A.  That, I don't recall.

25  Q.  But you remember Killer J and David Gay being together?

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1   A.  Yes.

2   Q.  And what was the nature or what was the topic of

3   conversation?

4   A.  Take 'em to the pawn shop.

5   Q.  The pawn shop?

6   A.  Yes.

7   Q.  What did you tell them?

8   A.  I was stalling 'em.

9   Q.  So you told them, essentially, temporarily, no, then,

10  correct?

11  A.  No, I told them "yeah" to stall them.

12  Q.  And then what did you do instead?

13  A.  I continued to pick up my niece from school.

14  Q.  What did you do after you got your niece?

15  A.  I dropped her off and then I met ATF on Eight Mile and

16  Stahelin at the CVS, and then they took me to the Schaefer

17  precinct.

18  Q.  To the Schaefer precinct?

19  A.  Correct.

20  Q.  How long after the murder was this that you met them at

21  the CVS?

22  A.  That, I can't recall.

23  Q.  How were you feeling at this point?

24  A.  Nervous.

25  Q.  How else were you feeling given that Marquise was your

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1    childhood --

2    A.  I was scared, I was hurt.

3    Q.  So when you get to the Schaefer precinct, what do you do?

4    A.  I sat down in a room and talked, spoke with a lady.

5    Q.  With a lady?

6    A.  Yes.

7    Q.  Was she a police officer?

8    A.  I think so.

9    Q.  And what did you tell her?

10   A.  I told her everything that happened the day of the murder.

11   Q.  Initially when you spoke to police, did you tell them that

12   you didn't know that they were going to -- that Killer J and

13   David Gay were going to kill somebody?

14   A.  Correct.

15           MR. GUREWITZ:  Objection, Your Honor, it

16   mischaracterizes the evidence, which is only that Killer J

17   shot a rifle that killed Marquise Robinson.

18           THE COURT:  I'm sorry, what's your objection?

19           MR. GUREWITZ:  My objection is to the form of the

20   question, the content of it.  It mischaracterizes the

21   evidence.  She said that they were going to kill someone.  The

22   evidence says that it was Killer J that shot the gun.

23           THE COURT:  Okay.  Let's just be careful about

24   pronouns.

25           MS. BROWN:  Understood.

Case No. 14-CR-20119

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1    **BY MS. BROWN:**

2    Q.  At some point when you were speaking with police, did you

3    tell them that it was your understanding that it was only

4    going to be -- that only a robbery would take place?

5    A.  Correct.

6              **MR. GUREWITZ:**  Objection, Your Honor, it's a

7    leading question.  This is direct examination.

8              **THE COURT:**  Overruled.

9    **BY MS. BROWN:**

10   Q.  You did tell police that?

11   A.  Yes.

12   Q.  Was there a reason why you didn't tell them about the

13   murder you'd learned about?

14   A.  I was scared.

15   Q.  What were you scared of?

16   A.  I was scared to go to jail and everything.

17   Q.  You were scared of what?

18             **THE COURT:**  Of what?

19   A.  To get in trouble.

20   **BY MS. BROWN:**

21   Q.  With the police?

22   A.  Yes.

23   Q.  Do you speak with the police again a short time later?

24   A.  Yes.

25   Q.  And do you tell them then the full -- your full perception

Case No. 14-CR-20119

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1    of what was going to happen?

2    A.  Yes.

3    Q.  What did you tell them?

4    A.  I told them that they told me that they -- that they was

5    planning on robbing and killing somebody.

6    Q.  At some point, did there come a time where you had to

7    testify in a trial?

8    A.  Yes.

9    Q.  And was it the trial related to this case?

10   A.  Yes.

11          MR. GUREWITZ:  Objection, Your Honor.  I don't --

12   to the, again, to the form of the question "was related to

13   this case."  I'm not sure what that means.

14          MS. BROWN:  I can clarify.

15   BY MS. BROWN:

16   Q.  Was there a murder trial of Jayjuan Watts and David Gay

17   about the shooting of Mr. Robinson?

18   A.  Yes.

19   Q.  And did you testify about what you observed relative to

20   your childhood friend being murdered in front of you?

21   A.  Yes, I did.

22   Q.  After you testified -- or before you testified in that

23   murder, did you have to -- could you stay at your house that

24   you were living in at the time?

25   A.  No, I couldn't.

Case No. 14-CR-20119

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1    Q.  Why not?

2    A.  I had to move.

3    Q.  Why did you have to move?

4    A.  ATF moved me.

5    Q.  Why did they move you?

6    A.  Because I witnessed Marquise being murdered, and my cover

7    was blew from working with them.

8    Q.  Your cover had been blown?

9    A.  Yes.

10   Q.  Where did they move you at first?

11   A.  To a hotel.

12   Q.  Did they move you immediately after the murder, or did

13   they wait?

14   A.  They moved me right after I left the precinct.

15   Q.  That same day, then?

16   A.  That same day, correct.

17   Q.  What city was that hotel located in?

18   A.  Livonia.

19   Q.  I'm sorry, what city?

20   A.  Livonia.

21   Q.  Livonia?

22   A.  Uh-huh.

23   Q.  Is that a yes?

24   A.  Yes.

25   Q.  At some point, did you or somebody else have to inform

Case No. 14-CR-20119

Antwuan Council - Direct Examination
Wednesday, July 29, 2015

1   your parents of what was going on, as well?

2   A.  Yes.

3   Q.  And were you present for that conversation?

4   A.  No.

5   Q.  Before you moved, were you still living at the house on

6   Sunderland, the one you told us you grew up at?

7   A.  Correct.

8   Q.  So when you moved to this hotel in Livonia, was there

9   anybody still living at Sunderland?

10  A.  No.

11  Q.  Where did they move when you moved to the hotel in

12  Livonia?

13  A.  With me.

14  Q.  They moved with you?

15  A.  Correct.

16  Q.  For what reason?

17  A.  Because we was a family, we all lived there together.

18  Q.  Because you were a family?

19  A.  Uh-huh.

20  Q.  Is that a yes?

21  A.  Yes.

22  Q.  At some point, did your sister move into the Sunderland

23  location?

24  A.  No.

25  Q.  Did there come a time in March of 2009 where you became

Antwuan Council - Direct Examination
Wednesday, July 29, 2015

1   aware that there had been something that had happened at your

2   Sunderland home?

3   A.  Yes.

4   Q.  And where were you living at the time?

5   A.  Hotel.

6   Q.  And how did you become aware of this?

7   A.  I think my brother-in-law told me at the time.

8   Q.  Did you ever come down to look at that?

9   A.  No.

10  Q.  Based on what you were told happened, did your sister, or

11  did your brother-in-law -- your brother-in-law is married to

12  your sister?

13  A.  Yes.

14  Q.  Did they take any action themselves?

15  A.  Yes.

16  Q.  What did they do?

17          **MR. GUREWITZ:**  Objection, hearsay.

18          **THE COURT:**  Well, if he knows.

19  **BY MS. BROWN:**

20  Q.  If you know, if you know, did you see them move somewhere?

21  A.  They moved out of the house they was in.

22  Q.  And was that the house on Sunderland, or a different

23  house?

24  A.  No, no, they was just coming to the Sunderland house to

25  check on it.

Case No. 14-CR-20119

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1    Q.  So they were coming to the house to check on it on

2    Sunderland?

3    A.  Yeah.

4    Q.  When something happened?

5    A.  No, because we left, our valuables were still there.  We

6    had just left.

7    Q.  So your sister was there at Sunderland for what purpose?

8    A.  Just to spend the night, just letting people know the

9    house was being occupied still.

10   Q.  Did you ever see photos of your house after something

11   happened there?

12   A.  Yes.

13   Q.  I'm going to direct you to exhibit, the tab number Exhibit

14   18 in that book, and ask you to look at what's located there

15   please.

16           Mr. Council, have you had an opportunity to look at

17   those pictures?

18   A.  Yes.

19   Q.  Do you recognize them?

20   A.  Yes.

21   Q.  And what do you recognize A through F to be?

22   A.  Bullet shots to the window.

23   Q.  That's your house, then?

24   A.  Yes, it is.

25   Q.  After the murder of Marquise Robinson, did you receive

Case No. 14-CR-20119

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1    threats?

2    A.  Yes.

3    Q.  How, in what manner?

4    A.  My Facebook page.

5    Q.  And did there come a time where you took one of those

6    threats and took a screen shot of it?

7    A.  No, I told Donovan about it and he took my Facebook page

8    over.

9    Q.  He adopted your Facebook page?

10   A.  Yes.

11   Q.  After you received a threat?

12   A.  Correct.

13           **MS. BROWN:**  May I approach, Your Honor?

14           **THE COURT:**  Yes.

15   **BY MS. BROWN:**

16   Q.  I'm handing you what's been marked Government proposed

17   Exhibit 143.  Do you recognize that document?

18   A.  Yes, I do.

19   Q.  And what do you recognize that to be?

20   A.  This is the threat I got.

21   Q.  Is it a shot of your Facebook page?

22   A.  Yes.

23   Q.  Could you read that threat for us, please?

24           **MR. GUREWITZ:**  It's not in evidence, I think, Your

25   Honor.

Case No. 14-CR-20119

Antwuan Council - Direct Examination
Wednesday, July 29, 2015

1           **THE COURT:**  It's not.

2           **MS. BROWN:**  Oh, sorry.  Fair enough.

3    **BY MS. BROWN:**

4    Q.  And does that fairly and accurately depict the way that

5    threat looked on your Facebook page?

6    A.  Yes.

7           **MS. BROWN:**  I'd move for admission of 143 at this

8    time.

9           **MR. GUREWITZ:**  No objection.

10          **THE COURT:**  Received.

11          (Government's Exhibit 143 received into

12          evidence.)

13   **BY MS. BROWN:**

14   Q.  Can you read that into evidence, please?

15   A.  "Bitch snitchn' on Killa J.  Gonna get, fact, yo whole

16   household bitch nigga, pussy ass, fagot and got -- and we

17   your -- and -- free Killa J pussy."

18   Q.  If we could move on, what's the date on that?  Can you

19   tell from looking at it what the date is?

20   A.  March 6.

21   Q.  Of what year, do you know?  Does it say?

22   A.  It's 2009.

23   Q.  So it was the same year?

24   A.  Yes.

25   Q.  So it was roughly one month after the murder?

Case No. 14-CR-20119

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1   A.  Correct.

2   Q.  When you read that on your Facebook page, how did that

3   make you feel?

4   A.  I was real nervous.

5   Q.  Did there come a time where you moved farther away from

6   Livonia?

7   A.  Yes.

8   Q.  Where did you move?

9   A.  Lansing.

10  Q.  Why did you move to Lansing?

11  A.  We moved from the house, they moved us to Lansing so I

12  could start my life over.

13  Q.  And who came with you when you say "they"?

14  A.  My mother, my father, my best friend, the dog, and my

15  girlfriend.

16  Q.  And where did you guys move?

17  A.  To Lansing.

18  Q.  To a home, or a hotel?

19  A.  A home.

20  Q.  How did that affect your life and the life of your

21  parents?

22  A.  Everything changed for us.

23  Q.  Did you have a job at the time?  Did you have to get a new

24  job?

25  A.  Yes.

Case No. 14-CR-20119

Antwuan Council - Direct Examination
Wednesday, July 29, 2015

1    Q.  What about your parents?

2    A.  Yes.

3    Q.  They had to, as well?

4    A.  Correct.

5    Q.  Why did your best friend get moved?

6    A.  He was living with us.

7    Q.  At the time?

8    A.  Yes.

9    Q.  On Sunderland?

10   A.  Yes.

11   Q.  Did there come a time that you learned that something else

12   had happened to your house on Sunderland?

13   A.  Yes.

14   Q.  What was that?

15   A.  Somebody set it on fire.

16   Q.  And do you remember how long that was after you -- or

17   after the murder trial -- or after the murder?  I'm sorry.

18   A.  No.

19   Q.  Was it in close proximity in time?

20   A.  Yes.

21          MS. BROWN:  If I may have one moment, Your Honor.

22          (Brief pause.)

23          MS. BROWN:  Your Honor, I have no further questions

24   of this witness at this time.

25          THE COURT:  Thank you.

Case No. 14-CR-20119

Antwuan Council – Direct Examination
Wednesday, July 29, 2015

1          (Brief pause.)

2              **MS. BROWN:**  Your Honor, I just realized I have

3    three questions related to three separate exhibits that I

4    failed to inquire of Mr. Council.  May I just ask those?

5              **THE COURT:**  Yes, go ahead.

6    **BY MS. BROWN:**

7    Q.  Mr. Council, I'm going to direct your attention to the tab

8    number 1 in front of you in the binder, please.

9    A.  Talking about the first page, right here?

10   Q.  Yes.

11             **MS. BROWN:**  If I may approach, Your Honor?

12             **THE COURT:**  You may.

13   **BY MS. BROWN:**

14   Q.  Do you recognize what's located there?

15   A.  Yes.

16   Q.  What is it?

17   A.  Marquise.

18   Q.  Is it a picture of him?

19   A.  Yes.

20   Q.  I'd move for the admission of Government's 1 at this time.

21             **THE COURT:**  Received.

22             (Government's Exhibit 1 received into evidence.)

23   **BY MS. BROWN:**

24   Q.  Ask you to turn to tab 2 please.  What's located there?

25   A.  A picture.

Case No. 14-CR-20119

Antwuan Council – Cross Examination
Thursday, July 29, 2015

1   Q.  Of who?

2   A.  Dave Gay.

3           **MS. BROWN:**  I'd move for the admission of 2 at this

4   time.

5           **THE COURT:**  Received.

6           (Government's Exhibit 2 received into evidence.)

7   **BY MS. BROWN:**

8   Q.  And then 3, please.

9   A.  Killer J.

10  Q.  Okay.  And that's Killer J, that's a photo of him?

11  A.  Correct.

12          **MS. BROWN:**  I'd move for the admission of 3 at this

13  time.

14          **THE COURT:**  Received.

15          (Government's Exhibit 3 received into evidence.)

16          **MS. BROWN:**  Thank you.

17  (12:31 p.m.)

18                          **CROSS EXAMINATION**

19  **BY MR. GUREWITZ:**

20  Q.  I want to talk to you about some things related to what

21  the time period is that you've been testifying about here

22  today and yesterday, Mr. Council, first of all.  So I'd like

23  to go back to what happened to you, to fix the time period.

24          You indicated that you were stopped and then

25  arrested by the Detroit Police in the spring of 2008.  Do you

Case No. 14-CR-20119

Antwuan Council – Cross Examination
Thursday, July 29, 2015

1    recall that?

2    A.  Correct.

3    Q.  I'm sorry, you have to speak up a little bit.

4    A.  Correct.

5    Q.  Okay.  And if I said to you that that date of that arrest

6    was April 28, 2008, does that sound right to you?

7    A.  The date, I isn't sure about.

8    Q.  But does that sound like it's right to you, about the end

9    of April of 2008 that that happened to you?

10   A.  I don't know the month it happened.

11   Q.  As a result of being arrested you spent some time in jail,

12   didn't you?

13   A.  Correct.

14   Q.  And then you eventually went to court, right?

15   A.  Correct.

16   Q.  You entered a guilty plea of possession of a firearm,

17   didn't you?

18   A.  Correct.

19   Q.  And it was after that happened that you first had contact

20   with Mr -- Agent Nether from the ATF, isn't that correct?

21   A.  Yes.

22   Q.  The reason that happened was because after you were

23   arrested, a person, probably a police officer who you know by

24   the name of Ju Ju, J-U, J-U, put you in touch with Agent

25   Nether, isn't that right?

Case No. 14-CR-20119

Antwuan Council – Cross Examination
Thursday, July 29, 2015

1    A.  Correct.

2    Q.  So at the time that you were arrested for these matters

3    you were already, as you describe it, associating with the

4    group that you described as the Bounty Hunters, isn't that

5    true?

6    A.  Correct.

7    Q.  In 2008, you were 18?

8    A.  Yes.

9    Q.  Were you still in high school?

10   A.  I was taking my GED class.

11   Q.  Where were you taking that?

12   A.  I was going to Hazel Park on Eight Mile.

13   Q.  How far did you go in high school before you stopped

14   attending classes?

15   A.  It was tenth grade.

16   Q.  And about how old were you in tenth grade?

17   A.  I think I was like 17, 16.

18   Q.  So if you were 16 years old, that would have been in 2006,

19   is that right?

20   A.  Correct.

21   Q.  After you left high school, did you get a job?

22   A.  Yes.

23   Q.  What were you doing?

24   A.  I was working at the grocery store, and then from the

25   grocery store I was working at a warehouse.

Case No. 14-CR-20119

Antwuan Council - Cross Examination
Thursday, July 29, 2015

1   Q.  Okay.  If you could just try to speak up.  I'm leaning

2   forward to make sure I hear you.  I want to make sure the

3   ladies and gentlemen of the jury do as well.

4   A.  Okay.

5   Q.  Thank you.  So were you still working those jobs in 2008

6   when you were arrested?

7   A.  Yes.

8   Q.  It was -- you testified here yesterday and told us that

9   you lived in a good home with parents who were concerned about

10  what you were doing, right?

11  A.  Correct.

12  Q.  And it was a pretty nice house, where there were three

13  automobiles available for you to use, is that right?

14  A.  Correct.

15  Q.  And one of those was a pickup truck, wasn't it?

16  A.  Pickup truck, no.

17  Q.  I'm sorry?

18  A.  No.

19  Q.  Okay.  But -- well, this area that you lived in on

20  Sunderland, is that the right street name?

21  A.  Correct.

22  Q.  Was an area, as you were in high school, that was starting

23  to get a little bit tough or dangerous, isn't that right?

24  A.  Yes.

25  Q.  Could you tell us, please, tell the ladies and gentlemen

Case No. 14-CR-20119

Antwuan Council - Cross Examination
Thursday, July 29, 2015

1    of the jury why that was so?

2    A.  I mean, kids was on, getting older, click -- gangs was

3    being formed.

4    Q.  When you dropped out of high school, which school were you

5    in?

6    A.  I was going to Inkster High.

7    Q.  Eastern?

8    A.  Inkster High.

9    Q.  Inkster High School.  Had you gone to Henry Ford?

10   A.  Yes.

11   Q.  And when did you leave Henry Ford to go to Inkster?

12   A.  I went to Henry Ford for about three months.

13   Q.  Did your parents move you to Inkster High School because

14   they thought it would be safer for you?

15   A.  Yes.

16   Q.  Was it, in fact, a problem that if you would walk across

17   the street on your way to school -- let me make sure that

18   fits.  Were you able to walk to Henry Ford to go to high

19   school from where you lived?

20   A.  No.

21   Q.  Okay.  Well, if you walked down from your street down to

22   Seven Mile, is that the closest busy street where there were

23   stores?

24   A.  Yes.

25   Q.  If you did that and you crossed a block from one street to

Antwuan Council - Cross Examination
Thursday, July 29, 2015

1    the other, would it be possible that you would feel threatened

2    by people who lived on the other block?

3    A.  The part of the time when I was in high school?

4    Q.  Yes.

5    A.  No.

6    Q.  Did that happen after you moved on to Inkster?

7    A.  Yeah.

8    Q.  And how long did you stay at Inkster?

9    A.  'Til I got to the tenth grade.

10   Q.  So when you were then arrested by the police in the spring

11   of 2008, you had been associating with the Bounty Hunter

12   people for awhile, is that right?

13   A.  Correct.

14   Q.  Several months?

15   A.  Yeah.

16   Q.  Maybe about the beginning of 2008 or the end of 2007?

17   A.  Correct.

18   Q.  And you started out in that group, then, as what you've

19   said was your title, a soldier, is that right?

20   A.  Correct.

21   Q.  And what you did was walk and -- on the streets with a

22   flag hanging out of your pocket, right?

23   A.  Correct.

24   Q.  What streets did you patrol?

25   A.  From Evergreen, Sunderland, up in that area.

Antwuan Council - Cross Examination
Thursday, July 29, 2015

1    Q.  That's where your family lived, isn't that right?

2    A.  Correct.

3    Q.  And then after you did that with that red flag or rag, as

4    it's referred to sometimes, hanging out, you would go home?

5    A.  Yes.

6    Q.  At some point in time, you got that pistol that you threw

7    down on the ground before you were arrested by the police from

8    somebody else who you were associating with, isn't that right?

9    A.  Correct.

10   Q.  Was that Ant?

11   A.  No, Bullet.

12   Q.  Bullet, okay.  You've testified here today about Bullet.

13   How long after you began associating with those people did you

14   meet Bullet?

15   A.  It was a little bit warm out, I think.

16   Q.  It was a warm part of the same year, right?

17   A.  Yes.

18   Q.  In the spring, probably, then, of 2008?

19   A.  Correct.

20   Q.  You got a gun.  When you were arrested, the police found

21   that there weren't any bullets -- I'm not talking about his

22   name -- but that gun didn't have any shells, cartridges in it

23   at the time, is that right?

24   A.  Correct.

25   Q.  So you were out there on the street walking around with a

Case No. 14-CR-20119

Antwuan Council - Cross Examination
Thursday, July 29, 2015

1   gun without any bullets.  Why were you doing that?

2   A.  I had just got it from Bullet that day.

3   Q.  That same day?

4   A.  Yes.

5   Q.  So your parents were watching out real carefully for you.

6   Beginning in about the end of 2007, beginning of 2008, when

7   you started associating with these people, did you tell your

8   mom what you were doing?

9   A.  No.

10  Q.  How about your dad?

11  A.  No.

12  Q.  Did you tell your sister?

13  A.  No.

14  Q.  So you kept that from them?

15  A.  Yes.

16  Q.  Basically, that's a lie, isn't it?

17  A.  Yes.

18  Q.  So were they the most important people in your life at

19  that time?

20  A.  Yes.

21  Q.  You said that the reason, one of the reasons that you

22  decided to become part of this group was because you just

23  didn't feel like you could put up with being beaten up when

24  you were all alone anymore, is that right?

25  A.  Correct.

Case No. 14-CR-20119

Antwuan Council - Cross Examination
Thursday, July 29, 2015

1    Q.  So that, as you've described it today, what you did was,

2    then, go out and join with other people who you participated

3    along with in beating up others, isn't that right?

4    A.  Correct.

5    Q.  And that's because you just didn't feel safe by yourself

6    anymore, is that right?

7    A.  Correct.

8    Q.  That was your reason?

9    A.  Correct.

10   Q.  So when you got arrested, did you call up your mom or dad

11   immediately?

12   A.  My mom was in the hospital.  She couldn't talk.

13   Q.  Were you concerned about how that information was going to

14   make your mom feel?

15   A.  Yes.

16   Q.  And was that enough to make you stop your involvement in

17   that activity?

18   A.  Yes.

19   Q.  So it was in about sometime middle of July that year,

20   about three months later, that you first had contact with

21   Agent Nether isn't that right?

22   A.  Yes.

23   Q.  And from the time you were arrested until you met up with

24   Agent Nether, you weren't in jail that whole time, were you?

25   A.  No.

Case No. 14-CR-20119

Antwuan Council - Cross Examination
Thursday, July 29, 2015

1   Q.  But you continued to have contact with the same people,

2   like Bullet, after you got out of jail, didn't you?

3   A.  Yes.

4   Q.  And you continued walking down the street with a red flag

5   in your pocket?

6   A.  No.

7   Q.  You continued hanging out with Bullet?

8   A.  If he was on the block, meaning on my neighborhood street,

9   yes.

10  Q.  I didn't understand that one.  Please say it again.

11  A.  Oh, if he was in the neighborhood, yes.

12  Q.  Were there other people who you had met along with Bullet

13  after you began associating with these people you call Bounty

14  Hunters who you continued to see?

15  A.  Yes.

16  Q.  Were you -- you, I think, said that your cousins were even

17  part of that group, is that right?

18  A.  Yes.

19  Q.  And you continued to see them, didn't you?

20  A.  Yes.

21  Q.  And what about this person you said that introduced you to

22  the group, his name was?

23  A.  Psycho.

24  Q.  You continued to see him, as well, right?

25  A.  Yes.

Case No. 14-CR-20119

Antwuan Council - Cross Examination
Thursday, July 29, 2015

1   Q.  Where did he live?

2   A.  He lived right across the street from me on the corner, so

3   like, go across the street, next house.

4   Q.  So as concerned as you were about how your mother felt

5   about what caused -- well, before I ask you that question,

6   after you got arrested, did you tell your mother that you had

7   been involved with the Bounty Hunters?

8   A.  No.

9   Q.  Did you tell your mother after she got out of the hospital

10  that you continued to be involved with them?

11  A.  No.

12  Q.  At some point, you had a sitdown with Agent Nether and

13  perhaps others at ATF where you talked to them about what it

14  would mean to be someone who was a confidential informant.

15  That happened, didn't it?

16  A.  Yes.

17  Q.  Had you ever heard of that kind of title before,

18  confidential informant?

19  A.  No.

20  Q.  Had you heard the term snitch?

21  A.  Yes.

22  Q.  And is that a kind of a word that people who you would

23  hang out with or talk to would use to refer to somebody on the

24  street?

25  A.  Yes.

Case No. 14-CR-20119

Antwuan Council – Cross Examination
Thursday, July 29, 2015

1   Q.  What did that mean to you?

2   A.  Telling on somebody.

3   Q.  Okay.  And what did you understand the difference between

4   working as a CI, or confidential informant, and snitch to be?

5   A.  The same thing.

6   Q.  But wasn't one of the differences that because you agreed

7   to do this with Agent Nether you understood that they were

8   going to pay you, right?

9   A.  Correct.

10  Q.  Did Agent Nether talk to you about rules that you had to

11  follow if you were going to get paid?

12  A.  Yes.

13  Q.  Do you remember any of those rules?

14  A.  Not all of them, no.

15  Q.  Well, do you remember any of them?

16  A.  Yes.

17  Q.  Tell me what you remember.

18  A.  Getting information.

19  Q.  So a rule you remember was that you had to give them

20  information, right?

21  A.  Yes.

22  Q.  Anything else?

23  A.  Not that I can recall.

24  Q.  Well, one that you answered a question about, I think,

25  yesterday was that there was a rule that you weren't supposed

Case No. 14-CR-20119

Antwuan Council - Cross Examination
Thursday, July 29, 2015

1   to commit any crimes, isn't that right?

2   A.  Correct.

3   Q.  You remember that now?

4   A.  Yes.

5   Q.  Was there any rule about staying in contact with Agent

6   Nether or Agent Davis?

7   A.  Yes.

8   Q.  What was that?

9   A.  Make sure that I let them know what's taking place when

10  it's happening.

11  Q.  And what did you understand the reason for that to be,

12  Mr. Council?

13  A.  So he -- so they could react on it quickly.

14  Q.  And by react, what did you understand to be the kind of

15  ways that they would react?

16  A.  Stop it.

17  Q.  Stop it?

18  A.  Yeah, solve it.

19  Q.  And were the recorded phone calls that you heard and were

20  asked questions about this morning, between you and

21  Mr. George, examples of what you thought that was all about,

22  where there was conversation about killing somebody, and they

23  would, the agents then be able to step in and stop it in some

24  way?

25  A.  Yeah.

Case No. 14-CR-20119

Antwuan Council - Cross Examination
Thursday, July 29, 2015

1   Q.  So when you say stop it, was that about bad stuff that

2   could happen because these people were part of the gang?

3   A.  Yes.

4   Q.  And the purpose was so that those kind of bad things

5   wouldn't occur, right?

6   A.  Correct.

7   Q.  And, for example, if there was going to be somebody -- you

8   went with somebody to get a gun, there was a gun in the car,

9   before that could be used, the Detroit Police would come up

10  and stop the car, right?

11  A.  Correct.

12  Q.  Well, you saw this extended video this morning, the one

13  where you were given a shirt that had a buttonhole with a

14  little camera in it, right?

15  A.  Correct.

16  Q.  Why don't you just explain for us a little bit about how

17  that worked.  Where exactly was that camera?

18          **MS. BROWN:**  Objection, relevance.  I'm going to

19  object to the relevance of that.

20          **THE COURT:**  Overruled.  You may answer.

21  A.  It was in one of the buttons, like this.

22  **BY MR. GUREWITZ:**

23  Q.  Okay.  So you're pointing to, you're wearing a short

24  sleeved button up shirt with a couple buttons, and it was just

25  there through a button hole on your shirt, right?

Case No. 14-CR-20119

Antwuan Council – Cross Examination
Thursday, July 29, 2015

1   A.  Yes, but it had buttons from the top to the bottom.

2   Q.  Okay.  And you had to then make arrangements with the ATF

3   agents to use that on that day, isn't that right?

4   A.  Correct.

5   Q.  That wasn't something like the cell phone that they gave

6   you some day in August that you had with you all the time, was

7   it?

8   A.  Correct.

9   Q.  And you met with him on the morning before you made those

10  recordings, didn't you?

11  A.  Yes.

12  Q.  And when you were all done with your activities and could

13  get away without letting anybody from your group know what

14  you're doing, you met with the agents to give it back to them,

15  right?

16  A.  Correct.

17  Q.  Did you make advance plans or preparations with that group

18  before that, not with -- let me start over again.  Did you

19  make contact with the agent before that day to set up that

20  meeting where you got the camera?

21  A.  Correct.

22  Q.  How long before that day did you arrange to meet with

23  them?

24  A.  That, I don't recall.

25  Q.  You don't recall?

Antwuan Council – Cross Examination
Thursday, July 29, 2015

1   A.  No.

2   Q.  But it was sometime before the morning when this recording

3   was made?

4   A.  Correct.

5   Q.  Was this the only time during this period from about

6   middle of July of 2008 until February of 2009 that you wore

7   that kind of a camera?

8   A.  That, I don't recall either.

9   Q.  Was it, as you can recall, the first time that ever

10  happened?

11  A.  No, actually, I wore it about three times, yes.

12  Q.  Okay.  So it was a, there were particular reasons, as you

13  understood it, to wear that kind of a device rather than just

14  use your cell phone, right?

15  A.  Correct.

16  Q.  And did you tell the agents when you met with them that

17  morning, or when you talked to them before that day, what you

18  thought was going to happen, what was going to go down on that

19  day that you'd be able to record?

20  A.  That, I don't recall.

21  Q.  Well, let me be a little bit more specific.  What we saw

22  in this was that you went to a location near Seven Mile and

23  Stahelin, right?

24  A.  Correct.

25  Q.  And you met first outside in an area that you called an

Case No. 14-CR-20119

Antwuan Council - Cross Examination
Thursday, July 29, 2015

1    alley, right?

2    A.   Correct.

3    Q.   And then there was an episode later on where you went to

4    this abandoned vacant house on Stahelin, right?

5    A.   Correct.

6    Q.   And that's the same one that you talked about at the end

7    of your testimony here today where your friend, Marquise

8    Robinson, was murdered, isn't that right?

9    A.   Correct.

10   Q.   And by the way, it would be fair, the way you would say it

11   was Marquise Robinson was one of your best friends, wasn't it?

12   A.   Correct.

13   Q.   You had known him all your life?

14   A.   Correct.

15   Q.   So if you were going out on this day with this recording

16   camera in your button, you told the agents that there was

17   going to be a meeting with other people where there would be

18   something to record, right?

19   A.   Correct.

20   Q.   And you told them that what you understood was going to

21   happen on that day was that there was going to be a

22   beating-in, right?

23   A.   Correct.

24   Q.   And you told them that it was going to be a beating-in of

25   a female, didn't you?

Case No. 14-CR-20119

Antwuan Council - Cross Examination
Thursday, July 29, 2015

1   A.  That, I don't know.

2   Q.  Would you consider -- well, let me ask you this about

3   these beatings-in, did you ever do one yourself to somebody

4   else?

5   A.  Correct, yes.

6   Q.  How many times?

7   A.  Multiple times.

8   Q.  Multiple times?

9   A.  Yes.

10  Q.  Did you do that after you started working with the agents

11  from the ATF?

12  A.  I think I did.

13  Q.  And would you consider that kind of beating that we just

14  saw here on the screen, on the monitor this morning, to be a

15  good thing or bad thing?

16  A.  Bad thing.

17  Q.  Okay.  And if that kind of bad thing was happening and you

18  told the agents about it, did they say, well, we're going to

19  step in and stop it?

20  A.  No.

21  Q.  And so when you knew that that was going to happen in

22  advance, you told them about it, didn't you?

23  A.  Correct.

24  Q.  Are you aware of any time that they ever stepped in to

25  stop one of these beat-ins that you participated in?

Case No. 14-CR-20119

Antwuan Council – Cross Examination
Thursday, July 29, 2015

1   A.  No.

2   Q.  So they let you go ahead and do these kind of things to

3   other people, is that right?

4   A.  Yes.

5   Q.  Beginning in about the middle of August of 2008, you

6   started receiving payments from an ATF agent, didn't you?

7   A.  Correct.

8   Q.  And those payments happened when the agents met with you,

9   isn't that right?

10  A.  Correct.

11  Q.  Did they give you a check written on the United States

12  Treasury?

13  A.  I signed a paper and initialed.

14  Q.  And what did you get?

15  A.  Money.

16  Q.  Cash?

17  A.  Yes.

18  Q.  At the end of the year, did they give you a little form

19  that says that Antwuan Council has been paid, for example,

20  $7,000 by the Alcohol, Tobacco, Tax and Firearm agency of the

21  United States?

22  A.  No.

23  Q.  Did you ever receive anything like that?

24  A.  No.

25  Q.  And what did you do with this money that you got?

Case No. 14-CR-20119

Antwuan Council - Cross Examination
Thursday, July 29, 2015

1   A.  I paid my cell phone bill, put gas inside the car, bought

2   diapers, whatever was needed.

3   Q.  I'm sorry, you bought what?

4   A.  Diapers.  I had a daughter at the time.

5   Q.  Where did she live?

6   A.  She lived with her mother.

7   Q.  I'm sorry, she lived where with her mother?

8   A.  She lived with her mother.

9   Q.  On the west side of Detroit?

10  A.  Yes.

11  Q.  Okay.  Let me show you what I have marked for

12  identification as Exhibit 503.  There's a listing on that of

13  payments on various dates for Antwuan Council.  To the best of

14  your ability to recall, does that seem to reflect the payments

15  that you received?

16  A.  Yes.

17          **MR. GUREWITZ:**  Your Honor, I'd move for its

18  admission at this time.

19          **THE COURT:**  Received.

20          (Defendants' Exhibit 503 received into evidence.)

21          **THE COURT:**  And let's stop for the day.  It's 1:00.

22  I know time flies.

23          (End of excerpt.)

24

25

Case No. 14-CR-20119

- - -

# C E R T I F I C A T I O N

I, Suzanne Jacques, Official Court Reporter for the United States District Court, Eastern District of Michigan, Southern Division, hereby certify that the foregoing is a correct transcript of the proceedings in the above-entitled cause on the date set forth.


s:\_____

  Suzanne Jacques, RPR, RMR, CRR, FCRR
  Official Court Reporter
  Eastern District of Michigan


- - -

Case No. 14-CR-20119